## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No. 1:23-cv-3294

COLORADO CONSERVATION ALLIANCE,
a Colorado Nonprofit Corporation,
CHRISTOPHER JURNEY,
and MICHAEL CLARK,
  Plaintiffs,

v.

UNITED STATES FISH AND WILDLIFE SERVICE,
COLORADO PARKS AND WILDLIFE COMMISSION,
COLORADO DIVISION OF PARKS AND WILDLIFE,
DAN GIBBS, in his official capacity as Executive Director
of the Colorado DEPARTMENT OF NATURAL RESOURCES,
and JEFF DAVIS, in his official capacity as Director of
COLORADO DIVISION OF PARKS AND WILDLIFE.
  Defendants.

---

## VERIFIED COMPLAINT, APPLICATION FOR INJUNCTIVE RELIEF, AND REQUEST FOR DELCARATORY JUDGMENT

---

## INTRODUCTION

1.  In this action, Plaintiffs, the Colorado Conservation Alliance ("CCA"), Christopher Jurney, and Michael Clark (collectively, "Plaintiffs") challenge Colorado Parks and Wildlife Commission and the Colorado Division of Parks and Wildlife (collectively "CPW"), the Executive Director of the Department of Natural Resources Dan Gibbs, the Director of Parks and Wildlife Jeff Davis, and the United States Fish and Wildlife Service's ("USFWS") (collectively "Defendants") process for wolf introduction in the state of Colorado. As it stands, the process is significantly deficient under the requirements of the National Environmental Policy Act of 1969

1

("NEPA"), 42 U.S.C. §§ 4321 *et seq*., and the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 551 *et seq*. Plaintiffs seek declaratory and injunctive relief preventing Defendants from moving forward with the introduction of the gray wolf in Colorado pending Defendants' full compliance with NEPA and the APA.

## **BACKGROUND**

2.      In the November 2020 elections, Colorado voters passed Proposition 114. The Proposition was a ballot measure that generally required the Colorado Parks and Wildlife Commission to reintroduce gray wolves (*Canis lupus*) in Colorado west of the Continental Divide by December 31, 2023.

3.      Proposition 114 passed by a narrow margin, with 50.91% of Coloradans voting in favor of the Act and 49.09% of Coloradans opposed.

4.      Proposition 114 is codified as Section 33-2-105.8 of Colorado Revised Statutes. The Statute directs CPW to:

   a.   Develop a plan to restore and manage gray wolves in Colorado, using the best scientific data available;

   b.   Hold statewide hearings to acquire information to be considered in developing such plan, including scientific, economic, and social considerations pertaining to such restoration;

   c.   Periodically obtain public input to update such plan;

   d.   Take the steps necessary to begin reintroductions of gray wolves by December 31, 2023, only on designated lands; and

e.   Oversee gray wolf restoration and management, including the distribution of state funds that are made available to:

    i.   Assist owners of livestock in preventing and resolving conflicts between gray wolves and livestock; and

    ii.   Pay fair compensation to owners of livestock for any losses of livestock caused by gray wolves, as verified pursuant to the claim procedures authorized by sections 33-3-107 to 33-3-110.

5.      Following the approval of Proposition 114, Colorado requested the USFWS to designate the proposed gray wolf population as a "nonessential, experimental" population under Section 10(J) of the Endangered Species Act ("ESA"). 16 U.S.C. § 1539(j). Gray wolves are currently listed as endangered in the United States outside of the Northern Rocky Mountain and Minnesota populations, including in Colorado.

6.      On November 3, 2020, USFWS issued a final rule delisting the gray wolf due to its recovery in the northern Rocky Mountains and great lakes regions. On February 10, 2022, however, the United States District Court for the Northern District of California vacated and remanded the rule, generally holding that it violated the ESA and the APA. *Defenders of Wildlife v. U.S. Fish and Wildlife Service*, 584 F.Supp.3d 812 (N.D. Cal. 2022). This returned management authority of the gray wolf outside of the Northern Rocky Mountain and Minnesota populations to USFWS. The map below depicts the boundaries of these populations with different levels of protection under the ESA:



U.S. FISH & WILDLIFE SERVICE, *2022 Gray Wolf Questions and Answers*, February 11, 2022, retrieved from: https://www.fws.gov/sites/default/files/documents/2022-Gray-Wolf-FAQs.pdf (last visited December 4, 2023).

7.    On May 3, 2023, CPW passed the final Colorado Wolf Restoration and Management Plan. COLORADO PARKS & WILDLIFE, COLORADO WOLF RESTORATION AND MANAGEMENT PLAN (May 3, 2023) retrieved from: https://cpw.state.co.us/Documents/Wolves /2023-Final-CO-Wolf-Plan.pdf (last visited December 8, 2023) (hereinafter "Wolf Restoration and Management Plan"). The Wolf Restoration and Management Plan contains 9 chapters outlining the steps for reintroduction and management of a gray wolf population in Colorado. *Id.* The plan contemplates the release of 10-15 wolves in the state each year for up to five years. *Id.*

8.    Due in large part to the endangered status of gray wolves outside of the Northern Rocky Mountain and Minnesota populations, and the vacating of USFWS's 2020 rule delisting the species, the Wolf Restoration and Management Plan contemplates extensive federal involvement

4

and control in the reintroduction effort. *See e.g.* Wolf Restoration and Management Plan at page 5 ("[a]s this plan is implemented, CPW will work in cooperation with the United States Fish and Wildlife Service (USFWS)"); page 14 ("[b]ecause of the uncertainty about the federal status of gray wolves, close coordination with USFWS has occurred throughout the plan development process and will necessarily continue through the implementation stages"). This is consistent with additional information regarding the Colorado reintroduction, including information published on CPW's website. COLORADO PARKS & WILDLIFE, *Wolf Management*, https://cpw.state.co.us/learn/Pages/CON-Wolf-Management.aspx (last visited December 4, 2023) ("Now CPW will work to meet the deadlines directed by statute, with reintroduction requiring a close partnership with the U.S. Fish and Wildlife Service."); ("CPW has been in communication with USFWS regarding wolf management from the outset of this restoration and management planning effort. In fact, USFWS was represented on the Technical Working Group that was assembled by CPW in planning efforts for reintroducing the species.").

9.      Without any additional rules in place—such as an ESA 10(j) designation—management authority of any gray wolves in Colorado would be the responsibility of USFWS.

10.      Following Colorado's request to USFWS to designate the proposed gray wolf population as a "nonessential, experimental" population under Section 10(j) of the Endangered Species Act ("ESA"), USFWS released a draft 10(j) rule and draft environmental impact statement ("EIS") in February of 2023. The public was permitted to participate and submit comments on the draft rule and draft EIS from February 17, 2023, to April 18, 2023. Plaintiffs were among the public participants that submitted comments, which addressed deficiencies in the draft EIS. *See e.g.* Jurney Decl. at ¶¶ 16-17; Clark Decl. at ¶¶ 14-15.

11.     USFWS released its final EIS and draft record of decision ("ROD") under NEPA on September 15, 2023, which was published in the Federal Register on September 19, 2023. 88 FR 64399.

12.     On November 8, 2023, the final ROD was published in the Federal Register. 88 FR 77014. Accordingly, the 10(j) rule became effective on December 8, 2023, 30 days after publication in the Federal Register. The final ROD provides that USFWS will implement "alternative 1" in the EIS, under which "the Service will approve a section 10(j) rule for the gray wolf population in Colorado, including any gray wolf living in, dispersing into, or reintroduced into the state, providing the Service and its designated agents management flexibility and providing for conservation of the species." *See* USFWS, *Record of Decision, Establishment of a Nonessential Experimental Population of the Gray Wolf (Canis Lupus) in Colorado* (Nov. 7, 2023) at 2, retrieved from https://www.fws.gov/media/final-record-decision-colorado-gray-wolf-10j-rule (last visited November 28, 2023).

13.     In October, 2023, CPW announced that it had reached a one-year agreement with the Oregon Department of Fish and Wildlife ("ODFW") to trap and transfer up to 10 gray wolves from northeastern Oregon to Colorado. The agreement came after other states—including Montana, Idaho, and Wyoming—declined to provide Colorado with wolves.

14.     Defendants are moving forward with trapping and transferring wolves into the state, as the 10(j) rule went into effect on December 8, 2023. Defendants plan to release wolves in the state between December, 2023 and March, 2024.

## PARTIES

### Plaintiffs

15.     Plaintiff Colorado Conservation Alliance, Inc. ("CCA") is a Colorado not-for-profit corporation dedicated to protecting wildlife and the rights and interests of individuals who ranch, farm, hunt, trap, fish, and recreate in the state. Jurney Decl. at ¶¶ 11-12; Clark Decl. at ¶ 8-9. CCA seeks to preserve the heritage and lifestyle of farmers, ranchers, landowners, livestock producers, outfitters, sportsmen, sportswomen, and other outdoor enthusiasts in Colorado by advocating for the sustainable use of the state's environmental resources, the protection of wildlife populations, and the right of individuals to engage in the lawful and ethically responsible of non-protected species. Jurney Decl. at ¶ 12; Clark Decl. at ¶ 9. CCA engages with other like-minded organizations to accomplish its stated purposes through educational, recreational, and conservation-based activities. Jurney Decl. at ¶ 13; Clark Decl. at ¶ 10. Directors of the CCA participated in public meetings on the development of the Wolf Restoration and Management Plan and USFWS's EIS, and voiced their concerns about the deficiencies contained therein. Jurney Decl. at ¶¶ 16-17; Clark Decl. at ¶¶ 14-15. CCA is made up of individuals who ranch, farm, raise and produce livestock, hunt, fish, trap, and otherwise recreate in the state. Jurney Decl. at ¶ 14; Clark Decl. at ¶ 11. These individuals have cultural, social, professional, scientific, recreational, psychological, aesthetic, economic, and other interests in the instant action, which have been and will continue to be adversely affected and irreparably injured if the Defendants release gray wolves in the state under their current EIS and ROD, and without going through the NEPA process for the introduction itself. *Id.*

16.     Plaintiff Christopher Jurney is a Colorado resident with extensive involvement and experience with wildlife in the state. Jurney Decl. at ¶¶ 1-11. Christopher Jurney previously served as the president of The Colorado Outfitters Association; he owned the Pest & Nuisance Wildlife Control Company for approximately two decades; he is a Director of the CCA; he was an outfitter in Colorado for approximately 35 years; he intends to continue being an outfitter for big game in the future; and he is a hunter, trapper, and outdoorsman in the state. *Id.* at ¶¶ 1-6. Christopher Jurney participated in public meetings on the development of the Wolf Restoration and Management Plan and USFWS's EIS, and voiced his concerns about the deficiencies contained therein. *Id.* at ¶¶ 16-17. Christopher Jurney has recreational, aesthetic, economic, cultural, social, professional, and other interests in this action, which have been and will continue to be adversely impacted and irreparably injured if the Defendants release gray wolves in the state under their current EIS and ROD, and without going through the NEPA process for the introduction itself. *See generally* Jurney Decl.

17.     Plaintiff Michael Clark is a Colorado resident who is a rancher, livestock producer, landowner, hunter, retired oil and gas producer, and a Director of the CCA. Clark Decl. at ¶¶ 1-4. Michael Clark owns two ranches that are involved in agricultural pursuits such as raising livestock and hay. *Id.* at ¶ 2. He also rents his land to other ranchers, livestock producers, and hunters to generate income. *Id.* at ¶ 5. Michael Clark participated in public meetings on the development of the Wolf Restoration and Management Plan and USFWS's EIS and voiced his concerns about the deficiencies contained therein. *Id.* at ¶¶ 14-15. Michael Clark has economic, recreational, aesthetic, cultural, social, professional, and other interests in this action, which have been and will continue to be adversely impacted and irreparably injured if the Defendants release gray wolves in the state

8

under their current EIS and ROD, and without going through the NEPA process for the introduction itself. *See generally* Clark Decl.

### Defendants

18.     Defendant USFWS is an agency within the U.S. Department of the Interior. USFWS is a federal agency with the primary responsibility of conserving and managing fish, wildlife, plants, and environmental resources in the country. USFWS is responsible for administering, implementing, and enforcing the ESA for wildlife species which include terrestrial and freshwater species. *See e.g.* 50 C.F.R. § 402.01(b). USFWS has been and will be significantly and heavily involved in Colorado's wolf introduction effort, including in developing the Wolf Restoration and Management Plan, introducing gray wolves in Colorado, and overseeing and implementing gray wolf restoration and management objectives in the state. USFWS also developed an EIS and ROD to attempt to designate the proposed gray wolf population as a "nonessential, experimental" population under Section 10(J) of the Endangered Species Act.

19.     Defendant Colorado Parks and Wildlife Commission (the "Commission") is a thirteen-member commission responsible for protecting, preserving, enhancing, and managing Colorado's wildlife, natural, scenic, and scientific resources. The Commission is a "type 1" entity under Colorado law. Co. Stat. § 33-9-101(9); Co. Stat. § 24-1-105. A number of powers and duties of the Commission are denoted in Co. Stat. § 33-9-102, which includes the ability to "adopt or revise any rules…that the commission deems necessary or convenient to effect the purposes of, and fulfill its duties under, this title." The Commission was and is responsible for developing the Wolf Restoration and Management Plan, introducing gray wolves in Colorado, and overseeing

gray wolf "restoration and management" in the state. Co. Stat. § 33-2-105.8. The Commission has been and will be relying on significant federal involvement in carrying out these objectives.

20.     Defendant Colorado Division of Parks and Wildlife (the "Division") is a "type 1" entity under Colorado law and is under the jurisdiction of the Commission. Co. Stat. § 33-9-104. The Division was and is responsible for assisting the Commission and USFWS in developing the Wolf Restoration and Management Plan, introducing gray wolves in Colorado, and overseeing and implementing gray wolf restoration and management objectives in the state. The Division has been and will be relying on significant federal involvement in carrying out these objectives. Collectively, the Commission and the Division are referred to as "CPW."

21.     Defendant Dan Gibbs is the Executive Director of the Colorado Department of Natural Resources ("DNR"). *See* Co. Stat. § 24-33-101. Dan Gibbs is named in his official capacity. The composition of the DNR includes CPW. Co. Stat. § 24-33-104(h). The duties of the Executive Director include serving on the Commission and appointing the Colorado Parks and Wildlife Director with the Commission. Co. Stat. § 33-9-103(1)(a). Upon information and belief, Dan Gibbs was and is heavily involved in developing the Wolf Restoration and Management Plan, introducing gray wolves in Colorado, and overseeing and implementing gray wolf restoration and management objectives in the state. Dan Gibbs has been and will be relying on significant federal involvement to do so.

22.     Defendant Jeff Davis is the Colorado Parks and Wildlife Director. Jeff Davis is named in his official capacity. Jeff Davis was appointed by the Commission as Director of Colorado Parks and Wildlife. *See* Co. Stat. § 33-9-103. The Director "shall execute, administer, perform, and enforce the rights, powers, duties, functions, and obligations vested previously in the

director of the division of wildlife and the director of the division of parks and outdoor recreation" and "shall exercise all the powers and perform all the functions of the commission in the interim between its meetings, subject to the ratification of the commission." *Id.* As specified, Jeff Davis is responsible for the actions of the Division and is responsible for "exercis[ing] all the powers and perform[ing] all the functions of the commission in the interim between its meetings." *Id.* Upon information and belief, Jeff Davis was and is heavily involved in developing the Wolf Restoration and Management Plan, introducing gray wolves in Colorado, and overseeing and implementing gray wolf restoration and management objectives in the state. Jeff Davis has been and will be relying on significant federal involvement to do so.

## JURISDICTION AND VENUE

23.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 (federal question jurisdiction); 5 U.S.C. §§ 701-706 (actions under the Administrative Procedure Act ("APA")); *Ex Parte Young*, 209 U.S. 123 (1908); and may issue declaratory and injunctive relief pursuant to 28 U.S.C. §§ 2201-2202.

24.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(e) because USFWS is an agency of the United States with numerous offices in Colorado; CPW is headquartered in Denver, Colorado; Jeff Davis, in his official capacity as Director of the Colorado Division of Parks and Wildlife, maintains a principle office in Denver, Colorado; Dan Gibbs, in his official capacity as Executive Director of the DNR, maintains a principle office in Denver, Colorado; a substantial part of the events or omissions giving rise to the claims occurred in this District; and Plaintiff CCA is headquartered in Littleton, Colorado.

25.     Plaintiffs have no other adequate remedy at law. Plaintiffs are adversely affected and/or aggrieved persons by federal agency action within the meaning of 5 U.S.C. § 702. Unless this Court grants Plaintiffs' requested relief, Defendants' actions will continue to cause significant harm to the environment, to Plaintiffs, and to the public interest. Monetary damages could not adequately compensate for these harms.

## STATUTORY FRAMEWORK

### Administrative Procedure Act

26.     The APA provides for judicial review of federal agency actions for "person[s] suffering a legal wrong because of agency action, or adversely affected or aggrieved by agency action…" 5 U.S.C. § 702. "Person" includes "an individual, partnership, corporation, association, or public or private organization other than an agency." *See Id.*; 5 U.S.C. § 551.

27.     The APA specifies that actions subject to judicial review are "[a]gency action[s] made reviewable by statute and final agency action[s] for which there is no other adequate remedy in a court…" 5 U.S.C. § 704.

28.     Under the APA, a reviewing Court shall "(1) compel agency action unlawfully withheld or unreasonably delayed" and "(2) hold unlawful and set aside agency action, findings, and conclusions found to be (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law; (B) contrary to constitutional right, power, privilege, or immunity; (C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right; (D) without observance of procedure required by law; (E) unsupported by substantial evidence in a case subject to sections 556 and 557 of this title or otherwise reviewed on the record of an agency hearing

12

provided by statute; or (F) unwarranted by the facts to the extent that the facts are subject to trial de novo by the reviewing court." 5 U.S.C. § 706.

## National Environmental Policy Act of 1969

29.     NEPA is designed to "ensure Federal agencies consider the environmental impacts of their actions in the decision-making process." 40 C.F.R. § 1500.1(a). "Simply by focusing the agency's attention on the environmental consequences of a proposed project, NEPA ensures that important effects will not be overlooked or underestimated only to be discovered after resources have been committed or the die otherwise cast." *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 349 (1989) (additional citations omitted).

30.     Compliance with NEPA prior to taking agency action is necessary to achieve NEPA's stated purposes of "encourag[ing] productive and enjoyable harmony between man and his environment," to "promote efforts which will prevent or eliminate damage to the environment and biosphere and stimulate the health and welfare of man," and to "enrich the understanding of the ecological systems and natural resources important to the Nation." 42 U.S.C. § 4321.

31.     The Council of Environmental Quality ("CEQ") has promulgated regulations to implement the requirements of NEPA. 40 C.F.R. §§ 1500, *et seq.*

32.     To accomplish its stated purposes, NEPA requires agencies to "take a 'hard look' at the environmental consequences before taking a major action." *Cure Land, LLC v. United States Department of Agriculture*, 833 F.3d 1223, 1230-31 (10th Cir. 2016) (quoting *Citizens Comm. to Save Our Canyons v. Krueger*, 513 F.3d 1169, 1178 (10th Cir. 2008)).

33.     Under NEPA, "where it is unclear whether a proposed action's environmental effects will significantly affect the quality of the human environment, an agency may prepare an

environmental assessment ("EA")." *WildEarth Guardians v. Wehner*, 546 F.Supp.3d 898, 903 (D. Col. 2021) (additional citations omitted). "If the EA leads the agency to conclude that the proposed action will not significantly affect the environment, the agency may issue a finding of no significant impact [FONSI] and proceed with the federal action without further ado." *Id.* (additional citations omitted).

34.     On the other hand, NEPA requires federal agencies to prepare a "detailed statement," known as an EIS, for all "major federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C).

35.     "Major federal actions" requiring the preparation of an EIS include "new and continuing activities, including projects and programs entirely or partially financed, assisted, conducted, regulated, or approved by Federal agencies…" 40 C.F.R. § 1508.1(q)(2). Overall, "major federal actions" are "actions by the federal government…and nonfederal actions with effects that may be major and which are potentially subject to Federal control and responsibility." *Ross v. Federal Highway Admin.*, 162 F.3d 1046, 1051 (10th Cir. 1998) (additional citations omitted).

36.     NEPA mandates that agencies "consider every significant aspect of the environmental impact of a proposed action" and "take a hard look at the environmental consequences **before** taking a major action." *Baltimore Gas and Elec. Co. v. Natural Resources Defense Council, Inc.*, 462 U.S. 87, 97 (1983) (additional citations omitted; internal quotations omitted; emphasis added).

37.     An EIS prepared pursuant to NEPA must "provide a full and fair discussion of significant environmental impacts and shall inform decision makers and the public of reasonable

alternatives that would avoid or minimize adverse impacts or enhance the quality of the human environment." 40 C.F.R. § 1502.1.

38.     An EIS must address "(i) reasonably foreseeable environmental effects of the proposed agency action; (ii) any reasonably foreseeable adverse environmental effects which cannot be avoided should the proposal be implemented; (iii) a reasonable range of alternatives to the proposed agency action, including an analysis of any negative environmental impacts of not implementing the proposed agency action in the case of a no action alternative, that are technically and economically feasible, and meet the purpose and need of the proposal; (iv) the relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity; and (v) any irreversible and irretrievable commitments of Federal resources which would be involved in the proposed agency action should it be implemented." 42 U.S.C. § 4332(2)(C).

39.     An EIS is required to "assess[] the predicted impacts of the proposed action on all aspects of the environment" which includes direct, indirect, and cumulative impacts. *New Mexico ex rel. Richardson v. Bureau of Land Management*, 565 F.3d 683, 703 (10th Cir. 2009); *see also Upper Green River Alliance v. United States Bureau of Land Management*, 598 F.Supp.3d 1303, 1321 (D. Wyo. 2022); 42 U.S.C. § 4332.

40.     Additionally, when taking a "hard look" at environmental impacts, "[a] 'hard look' should involve a discussion of adverse impacts that does not improperly minimize negative side effects." *Northern Alaska Environmental Center v. Kempthorne*, 457 F.3d 969, 975 (9th Cir. 2006) (citing *Native Ecosystems Council v. U.S. Forest Service*, 428 F.3d 1233, 1241 (9th Cir. 2005)).

An "important ingredient of an EIS is the discussion of steps that can be taken to mitigate adverse environmental consequences." *Robertson*, 490 U.S. at 351.

41.     "The statutory requirement that a federal agency contemplating a major action prepare such an environmental impact statement serves NEPA's 'action-forcing' purpose in two important respects." *Id.* at 349. Initially, it "ensures that the agency, in reaching its decision, will have available, and will carefully consider, detailed information concerning significant environmental impacts." *Id.* Further, "it also guarantees that the relevant information will be made available to the larger audience that may also play a role in both the decision-making process and the implementation of that decision." *Id.*

## Application to State Action

42.     "Major federal actions" not only include actions taken solely by the federal government, but also "nonfederal actions with effects that may be major and which are potentially subject to Federal control and responsibility." *Ross v. Federal Highway Admin.*, 162 F.3d 1046, 1051 (10th Cir. 1998) (additional citations omitted).

43.     In actions brought under the APA, "a few courts have held—without much analysis—that non-federal entities are not proper defendants in an APA case and therefore cannot be enjoined…[b]ut the substantial weight of authority goes the other way." *Zeppelin v. Federal Highway Administration*, 293 F.Supp.3d 1267, 1283 (D. Col. 2017) (additional citations omitted). The Tenth Circuit follows the majority view. *Id.* Under that view, a non-federal entity may be enjoined in an APA case based on a consent theory, meaning that the entity's consent to federal involvement effectively operates as consent to be subjected to federal requirements. *Id.* at 1283-84.

44.     Under the consent theory, the analysis focuses on whether the non-federal entity had "pervasive and long-standing" federal involvement, or whether the non-federal entity had "comparatively little federal involvement." *Id.* at 1284. "Somewhere in between those two poles, a non-federal entity's participation with the federal government becomes irrevocable consent to federal statutory requirements, such as NEPA, which is enforceable through the APA." *Id.*

## GENERAL ALLEGATIONS OF FACT AND INFORMATION

### Deficiencies in Final EIS issued by USFWS

45.     In USFWS's final EIS analyzing the proposed action to designate a gray wolf population that would be reintroduced into Colorado as an experimental population under section 10(j) of the ESA, USFWS admits that "[d]evelopment of this 10(j) rule is considered a major federal action requiring review under [NEPA]." U.S. FISH AND WILDLIFE SERVICE, FINAL ENVIRONMENTAL IMPACT STATEMENT, COLORADO GRAY WOLF 10(J) RULEMAKING (i) (September, 2023).

46.     As it stands, the EIS issued by USFWS is significantly deficient under the requirements of NEPA.

47.     For instance, the wolves to be introduced to Colorado from Oregon are northern wolves that disbursed to Oregon following the introduction northern wolves to Yellowstone National Park and Idaho in the 1990s. Cronin Decl. at ¶ 10.

48.     Wolves can disburse hundreds of miles and establish new populations. *Id.* Gray wolves introduced in Colorado may migrate and disburse into Arizona and New Mexico where the Mexican wolves are present. *Id.* at ¶ 11.

49.     USFWS recognizes the Mexican wolf as a distinct subspecies from the northern gray wolf and manages them accordingly. *Id.* at ¶ 14. In its EIS, USFWS found that northern wolves introduced in Colorado should not be allowed to disperse and interbreed with Mexican wolves in Arizona and New Mexico. *Id.* at ¶ 16.

50.     Pages 4-38 and 4-39 of the EIS address the potential impact of introduced northern wolves from Colorado dispersing and interbreeding with Mexican wolves:

> "Interbreeding between gray wolves and Mexican wolves could result in genetic swamping (gene flow from gray wolves to Mexican wolves, resulting in hybridization) of the Mexican wolf population, potentially threatening the genetic integrity of the Mexican wolf population (Odell et al. 2018). …The loss of genetic integrity of Mexican wolves by hybridization with northern wolves would impede recovery efforts of the separately (ESA) listed Mexican wolf. …if the ranges of gray wolves and Mexican wolves expanded and eventually overlapped, the Mexican wolf population could be adversely affected by *interspecific* competition and hybridization … If Mexican wolves disperse northward of their historical range, or if gray wolves disperse southward, competition or interbreeding could occur. …the Service will work with states to minimize impacts to Mexican wolf recovery."

> *See Id.* at ¶ 17.

51.     Page 4-39 of the EIS proposes to avoid these potential impacts:

> "To support Mexican wolf recovery, the Service is working with CPW and neighboring states to address management of wolves should the wolves expand outside Colorado toward the range of the Mexican wolf. Any take of gray wolves that expand outside Colorado *will be* addressed through one 10(a)(1)(A) permit in support of an memorandum of understanding between the neighboring states and the state of Colorado. The Service will be a signatory to this memorandum of understanding. These efforts are part of the Mexican wolf recovery that will minimize interactions and protect the genetic integrity of Mexican wolves. The Service's simultaneous issuance of a 10(a)(1)(A) permit to be held by the service is a separate action, authorizing state, federal, and Tribal partners to assist in the capture and return of wolves originating from the Colorado experimental population. (See section 1.7.1)." (Italics added).

> *See Id.* at ¶ 18.

52.     The EIS is deficient in this respect because the memorandum of understanding with neighboring states has not been established, and a detailed plan for protecting the Mexican wolf is not presented. *Id.* at ¶ 19. This is integral to USFWS's objectives, as northern gray wolves have already dispersed into Arizona and New Mexico. *Id.*

53.     A detailed plan, with specific management objectives, explicitly designating how northern wolves will be prevented from interbreeding and competing with Mexican wolves is needed for the EIS to be adequate and complete under the requirements of NEPA. *See Id.* at ¶ 20. The genetic integrity and overall protection of the Mexican wolf is compromised without such a plan and its corresponding management objectives. *Id.*

54.     Formal agreement with neighboring states is also necessary for the EIS to be adequate and complete under the requirements of NEPA. *See Id.* at ¶ 21. The protection of the genetic integrity of the Mexican wolf is not secured without documented agreement of the plan to protect Mexican wolves by USFWS, Colorado and neighboring states. *Id.*

55.     In effect, with regard to the protection of the Mexican wolf, the EIS simply states that the issue "will be addressed." *See Id.* USFWS describes the threat to Mexican wolves posed by the northern wolves in Colorado in the EIS, but without formal agreements with neighboring states in place, the plan to protect the genetic integrity and overall protection of the Mexican wolf will be compromised. *Id.*

56.     Additionally, the EIS does not contain analyses regarding the potential numbers of wolves that will eventually occupy Colorado and the numbers of prey they will kill. *See Id.* at ¶ 25.

57.     Neither CPW in its Wolf Restoration and Management Plan, nor USFWS in the EIS, identify objectives for the long term and denote/analyze the number and distribution of wolves in Colorado or the effects of these numbers on prey populations and the environment. *See Id.* These are significant considerations that need to be addressed and analyzed for the EIS to comply with NEPA. *See Id.*

**Necessity of NEPA Review for Wolf Introduction Itself**

58.     As part of its wolf introduction effort, CPW requested that USFWS designate the proposed Colorado gray wolf population as a nonessential, experimental population under 10(j) of the ESA.

59.     As part of its introduction effort, CPW has warranted in its Wolf Restoration and Management Plan that "[a]s this plan is implemented, CPW will work in cooperation with the United States Fish and Wildlife Service (USFWS)." Wolf Restoration and Management Plan at ii.

60.     As part of its introduction effort, CPW has warranted in its Wolf Restoration and Management Plan that "CPW program managers, and if appropriate, USFWS personnel, will consider context on the ground (biological and social considerations for population growth, pack dynamics and distribution of wolves, recent and proximal depredations, etc.) when determining if lethal control should be applied." *Id.*

61.     As part of its introduction effort, CPW has warranted in its Wolf Restoration and Management Plan that "[a]ll management of wolves in Colorado will be done in compliance with all state and federal laws and regulations." *Id.*

62.     As part of its introduction effort, CPW has warranted in its Wolf Restoration and Management Plan that "it will be important for federal agencies and CPW to collaborate on public

land issues as they relate to wolf management, which may include recreation, grazing management, public access, or habitat manipulation." *Id.* at iii.

63.     As part of its introduction effort, CPW has warranted in its Wolf Restoration and Management Plan that "CPW will work with the USFWS to coordinate monitoring activities while the species remains federally listed as threatened or endangered under the ESA." *Id.* at iii.

64.     As part of its introduction effort, CPW has warranted in its Wolf Restoration and Management Plan that "CPW will continue to coordinate with other agencies and organizations to achieve wolf conservation and management objectives. This will be accomplished by continuing to use the expertise of the USFWS, the U.S. Department of Agriculture's Wildlife Services Program Animal Plant Health Inspection Service (APHIS), U.S. Forest Service (USFS), Bureau of Land Management (BLM), Colorado Department of Agriculture (CDA), tribal governments, private sector professionals, and other state agencies." *Id.* at iv.

65.     As part of its introduction effort, CPW again warranted in its Wolf Restoration and Management Plan that "CPW will work in cooperation with the USFWS as this Plan is implemented." *Id.* at 1.

66.     As part of its introduction effort, CPW has warranted in its Wolf Restoration and Management Plan that "[b]ecause of the uncertainty about the federal status of wolves, close coordination with USFWS has occurred throughout the Plan development process and will necessarily continue through the implementation stages." *Id.* at 6.

67.     As part of its introduction effort, CPW has warranted in its Wolf Restoration and Management Plan that "[t]his wolf reintroduction effort will be undertaken by CPW in cooperation

with Federal agencies, potentially affected Tribes, and the states of Idaho, Montana, and/or Wyoming from which wild wolves will be transferred via agreement." *Id.* at 20.

68.     As part of its introduction effort, CPW has warranted in its Wolf Restoration and Management Plan that, "[t]he lethal control of chronically depredating wolves following depredation events will be conducted by state or federal agents (consistent with applicable law) if determined to be appropriate, after an evaluation of the circumstances, in all phases." *Id.* at 27.

69.     As part of its introduction effort, CPW has warranted in its Wolf Restoration and Management Plan that "[t]he lethal control of wolves that have attacked (but are not in the act of attacking) may be employed by state or federal agents in any phase of wolf management in the state." *Id.* at 28.

70.     As part of its introduction effort, CPW has warranted in its Wolf Restoration and Management Plan that "[t]he removal of a denning pack is allowed in all phases of wolf management but must be conducted by state or federal agents." *Id.*

71.     As part of its introduction effort, CPW has warranted in its Wolf Restoration and Management Plan that "[t]ake (non-lethal and lethal) by state and federal agents is allowed for efforts related to the release, tracking, monitoring, recapture, and management of wolves in Colorado…" *Id.*

72.     As part of its introduction effort, and with regard to the Agency take of wolves determined to be a threat to human life and safety, CPW has warranted in its Wolf Restoration and Management Plan that a "State or Federal agent may promptly remove any wolf that is determined to be a threat to human life or safety." *Id.* at 29.

73.    As part of the introduction effort, and with regard to the taking of wolves in the act of attacking or chasing livestock, CPW has warranted in its Wolf Restoration and Management Plan that "[a] retroactive permit may be issued to any landowner that takes a gray wolf in the act of attacking livestock on their private land or state or federal land that they are legally grazing. A landowner must provide evidence of livestock, stock animals recently (within 24 hours, unless impractical, but no later than 72 hours) wounded harassed or killed by wolves and state or federal agents are able to confirm that the animals were attacked by wolves." *Id.*

74.    As part of the introduction effort, and with regard to the agency take of chronic depredating wolves, CPW has warranted in its Wolf Restoration and Management Plan that "State or federal agents may carry out hazing, non-lethal control measures, or lethal control of problem wolves." *Id.*

75.    As part of the introduction effort, and with regard to additional take provisions for agency employees, CPW has warranted in its Wolf Restoration and Management Plan that "[a]ny employee or agent of CPW or USFWS or appropriate state or federal or tribal agency, who is designated in writing, when acting in the course of official duties may take a wolf from the wild" under various specified circumstances. *Id.*

76.    As part of its introduction effort, CPW has warranted in its Wolf Restoration and Management Plan that "Federal land management agencies have sole management discretion over their lands. CPW has no legal authority to implement restrictions or land management prescriptions on lands it does not own or lease. Therefore, it will be important for federal agencies and CPW to collaborate on land use issues as they relate to wolf management, which may include recreation, grazing management, public access, or habitat manipulation. CPW will facilitate on-going

collaboration with Federal land managers in instances where wolf presence or behavior may warrant temporary public land access restrictions." *Id.* at 30.

77.     As part of its introduction effort, CPW has warranted in its Wolf Restoration and Management Plan that "CPW staff developed the conflict minimization plan based on technical and social considerations from the TWG and SAG as well as input from other state and federal wildlife management agencies." *Id.* at 31.

78.     As part of its introduction effort, CPW has warranted in its Wolf Restoration and Management Plan that "[t]o better assist livestock owners in preventing and resolving conflicts between wolves and livestock, CPW hired a Wolf Conflict Coordinator to serve as the statewide subject matter expert on wolf-livestock conflicts. This position works proactively with CPW staff, internal workgroups, NGOs, livestock stakeholder groups, and state and federal agencies to identify, coordinate, implement, and evaluate a variety of conflict minimization techniques and methods to minimize wolf-livestock conflicts." *Id.*

79.     As part of its introduction effort, CPW has warranted in its Wolf Restoration and Management Plan that "[c]onflict minimization hazing techniques must comply with state and federal regulations and must be authorized by the USFWS while wolves are federally listed." *Id.*

80.     As part of its introduction effort, CPW has warranted in its Wolf Restoration and Management Plan that "CPW will work with USFWS to coordinate monitoring activities while the species remains federally listed as threatened or endangered under the ESA." *Id.* at 36.

81.     As part of its introduction effort, CPW has warranted in its Wolf Restoration and Management Plan that "[o]ngoing and future monitoring and research efforts are dependent upon the ability to secure future funding and adequate staffing. CPW anticipates that some of these

activities will be conducted in collaboration with other state and federal agencies, colleges and universities, and other relevant entities." *Id.*

82.     As part of its introduction effort, CPW has warranted in its Wolf Restoration and Management Plan that "[t]he illegal take of wolves will be expeditiously and thoroughly investigated. While wolves are federally listed as threatened or endangered in Colorado, the USFWS Office of Law Enforcement is the lead investigative agency; when they are federally delisted, CPW will be the lead, unless otherwise outlined in an MOU between the agencies." *Id.* at 37.

83.     As part of its introduction effort, and with regard to the basic tenets for funding a wolf conservation program, CPW has warranted in its Wolf Restoration and Management Plan that "[s]eparate funds for compensation and conflict minimization (nonlethal or lethal) can provide opportunities for specific kinds of funding sources. For example, federal livestock demonstration funds can be used for livestock loss compensation, and APHIS nonlethal funding as well as private donations could support conflict minimization." *Id.* at 42.

84.     As part of its introduction effort, CPW has warranted in its Wolf Restoration and Management Plan that "CPW, after reviewing input from the public, wildlife professionals, coordinating states, other state and federal agencies, etc., will modify and adapt the wolf management program in the future to maintain a viable wolf population within a complex environment." *Id.* at 43.

85.     As part of its introduction effort, CPW "invited technical experts to serve on the Technical Working Group (TWG) to provide and review objective, science-based information as well as provide their own knowledge and expertise at the state/federal/Tribal level to inform the

development of the Colorado Wolf Restoration and Management Plan." *Id.* at Appendix B-3. Technical Working Group members included Scott Becker, the "Region 6 Wolf Coordinator for the U.S. Fish and Wildlife Service"; Dr. Stewart Black, a "researcher for the USDA-National Wildlife Research Center"; Steve Lohr, "Director of Renewable Resources for the Rocky Mountain Region" at the United States Forest Service; Martin Lowney, a "wildlife damage management biologist for the United States Department of Agriculture, Wildlife Services program"; and Doug Smith, a "Senior Wildlife Biologist in Yellowstone National Park" for the National Park Service. *Id.* at Appendix B-12-16.

86.     As part of its introduction effort, CPW has warranted under its "Wolf Management" page of its website that "CPW will work to meet the deadlines directed by statute, with reintroduction requiring a close partnership with the U.S. Fish and Wildlife Service." COLORADO PARKS AND WILDLIFE, *Wolf Management*, https://cpw.state.co.us/learn/Pages/CON-Wolf-Management.aspx.

87.     As part of its reintroduction effort, CPW has warranted under its "Wolf Management" page of its website that "CPW has been in communication with USFWS regarding wolf management from the outset of this restoration and management planning effort. In fact, USFWS was represented on the Technical Working Group that was assembled by CPW in planning efforts for reintroducing the species." *Id.*

88.     CPW, Dan Gibbs, and Jeff Davis have and will continue to utilize, rely on, request, and consent to significant and substantial federal involvement in developing the Wolf Restoration and Management Plan, introducing gray wolves in Colorado, and overseeing and implementing

gray wolf restoration and management objectives in the state. Federal involvement, primarily from USFWS, has been and will continue to be thorough, pervasive, long-standing, and active.

89.     Based on information and belief, substantial federal resources—including time, money, and effort—have been and will continue to be expended on Colorado's wolf introduction. CPW, Dan Gibbs, and Jeff Davis have and will continue to utilize, rely on, request, and consent to the expenditure of these federal resources on the state's wolf introduction.

90.     Wolf introduction in Colorado—and the process itself—has been and will continue to be subject to substantial federal control and responsibility.

91.     The EIS issued by USFWS—which is deficient in and of itself—is limited to designating the proposed gray wolf population in Colorado as a nonessential, experimental population under 10(j) of the ESA. It does not concern the environmental analysis required under NEPA for the wolf introduction itself. *See e.g.* U.S. FISH AND WILDLIFE SERVICE, FINAL ENVIRONMENTAL IMPACT STATEMENT, COLORADO GRAY WOLF 10(J) RULEMAKING (3-1) (September, 2023) (addressing public comments and stating "[o]ther commenters were concerned about the use of lethal management measures, reintroduction in general, or about the population levels of gray wolf that could be sustained in Colorado. **These issues are outside the scope of the 10(j) rule and this EIS or do not meet the purpose and need for the proposed action as described in section 2.3.3; therefore, they are not analyzed in the EIS**.") (emphasis added).

92.     Neither CPW, USFWS, Dan Gibbs, Jeff Davis nor any other department, agency, or entity has conducted nor completed the environmental review process required by NEPA for wolf introduction itself.

93.     There are significant environmental considerations that have not been addressed by Defendants pertaining to wolf introduction in Colorado.

94.     For instance, with wolf introduction, *Echinococcus canadensis* (genotypes G8 and G10) has the potential to spread across Colorado and have detrimental impacts on wildlife, livestock, and humans. *See generally* Steele Decl.; Gore Decl.; Love Decl.

95.     Echinococcus larval tapeworms are consumed by canids (such as wolves and dogs) when consuming infected ungulates. Gore Decl. at ¶ 6; Steele Decl. at ¶ 6. The larva mature in the intestine and release infective eggs which are excreted in the feces of the infected animal. *Id.* These eggs can spread to the surrounding environment, contaminating vegetation. *Id.* Ungulates ingest these eggs while they feed on vegetation contaminated from the infected feces. *Id.* Once the egg is ingested by the ungulate, it hatches and extends through the small intestine to migrate to other organs, including the brain, heart, and/or liver. Gore Decl. at ¶ 6. Carnivores ingest the cysts when feeding on the infected ungulate and the biological cycle repeats. *Id.* Livestock and humans can also become infected when interacting with the environment and/or infected animals. *See* Love Decl. at ¶¶ 6-11; Gore Decl. at ¶¶ 8-10; Steele Decl. at ¶¶ 6-11.

96.     Between 2006 and 2008, a survey of wolves found a 62% positive rate for *Echinococcus canadensis* in Idaho wolves and a 63% positive rate in Montana wolves. Gore Decl. at ¶ 7; Steele Decl. at ¶ 7. These are the wolves that have expanded into Washington and Oregon. Gore Decl. at ¶ 7.

97.     In January of 2020, three of six fecal scat samples collected from four Colorado wolves (three females and one male) were positive for *Echinococcus canadensis*, genotype 8. Love

Decl. at ¶ 5. One of these samples had 300 eggs per gram of feces, making that sample significantly infectious. *Id.*

98.     While infected wolves can be treated, when released the treated wolves will commingle with nontreated wolves and ungulates and become infected again. Gore Decl. at ¶ 7. As wolves are introduced in Colorado and more wolf-wildlife-livestock predation occurs, this disease will spread across the state. Love Decl. at ¶ 5; Gore Decl. at ¶ 7; Steele Decl. at ¶ 8.

99.     There is significant potential for infection in livestock, wildlife, and even humans. *See generally* Love Decl.; Gore Decl.; Steele Decl. When infective eggs are ingested, they are transported in the bloodstream and form hydatid cysts on internal organs, including the liver, lungs, kidneys, and bones. Steele Decl. at ¶ 9. The cysts themselves can cause damage to the host by pressing on and damaging the organs and, in more severe cases, organ failure and even death. *Id.*

100.     Infection in livestock can cause substantial economic losses for livestock producers. Love Decl. at ¶¶ 8-10. Echinococcus disease is classified by USDA-FSIS as a regulated livestock/human pathogen. Gore Decl. at ¶ 8. Infected livestock may have reduced carcass values; decreased meat, milk, and wool production; and delayed fecundity, growth, and performance. *Id.* Infection can make portions of—or the entire—livestock carcass unfit for human consumption, resulting in a direct loss to the livestock producer. Love Decl. at ¶¶ 8-10; Gore Decl. at ¶ 10.

101.     Effects similar to those observed in livestock, such as loss of milk production and delayed fecundity, growth, and performance are also likely in deer and elk infected with *Echinococcus canadensis*. Steele Decl. at ¶ 9. Infected ungulates will also have tainted meat, making the animal unfit for human consumption. Gore Decl. at ¶ 10.

102.     Echinococcus larval tapeworms can also affect humans. *Id.* at ¶ 9. Echinococcus tapeworms are currently affecting millions of people worldwide and are causing hundreds of millions of dollars in annual losses related to human infection. *Id.* When humans become infected, they develop hydatid cysts that can vary in size between ½ inch in diameter to 4-5 inches in diameter. Love Decl. at ¶ 7. These cysts develop on various organs in humans. *Id.* If the cyst ruptures, the foreign proteins in the body can produce significant adverse side effects, including death from anaphylaxis. *Id.* Treatment of the infection in humans is very difficult, prolonged, and expensive. *Id.*; Steele Decl. at ¶ 10.

103.     The effects of the infection are substantially delayed. Steele Decl. at ¶ 10. A host may not experience symptoms for decades. *Id.* The prolonged time between infection and becoming symptomatic makes the infection more difficult to treat. *Id.*

104.     The Colorado Wolf Restoration and Management Plan does not present an adequate analysis (and/or any analysis) of *Echinococcus canadensis* with regard to the introduction of wolves in the state and its impacts on wildlife, livestock, and humans. Notably, the word "Echinococcus" only appears twice in the 261-page Wolf Restoration and Management Plan, in Appendix E, when discussing Technical Working Group recommendations.

105.     The EIS issued by USFWS does not present an adequate analysis of *Echinococcus canadensis* with regard to the introduction of wolves in the state and its impacts on wildlife, livestock, and humans. Notably, in the "Public Scoping Comment Summary" contained in the EIS, in responding to a public comment about the spread of Echinococcus, USFWS responded "[p]otential changes in the geographic extent of diseases or disease vectors as a result of the presence of gray wolves on the landscape would be a potential consequence of the State's plan to

reintroduce wolves and would not be influenced by issuing and implementing the 10(j) rule; **therefore, it is outside the scope of the 10(j) rule and FEIS**." U.S. FISH AND WILDLIFE SERVICE, FINAL ENVIRONMENTAL IMPACT STATEMENT, COLORADO GRAY WOLF 10(J) RULEMAKING (Public Comment and Analysis Report at 104) (September, 2023) (emphasis added).

106.    Upon information and belief, this is only one of the major issues that has not been adequately addressed under the current plans for wolf introduction in Colorado. Other major issues include an inadequate analysis of the potential number of wolves on the landscape, the distribution of wolves on the landscape, and the effects of these numbers on prey populations and the environment. Cronin Decl. at ¶ 25. These issues need to be addressed prior to the introduction of wolves in Colorado.

107.    Wolf introduction in Colorado is a major federal action significantly affecting the quality of the human environment. No defendant has conducted nor completed the environmental review process required by NEPA for wolf introduction itself, in violation of NEPA and the APA.

## COUNT I: VIOLATIONS OF THE ADMINISTRATIVE PROCEDURE ACT AND NATIONAL ENVIRONMENTAL POLICY ACT

108.    Plaintiffs reallege and incorporate by reference each and every allegation contained in the preceding paragraphs as though fully set forth herein.

109.    The EIS prepared by USFWS designating the proposed Colorado wolf population as a nonessential, experimental population under section 10(j) of the ESA is deficient under the requirements of NEPA and in violation of the APA.

110.    The EIS prepared by USFWS contains inadequate and incomplete analyses regarding the protection of the Mexican wolf; and the potential number of wolves on the landscape,

the distribution of wolves on the landscape, and the effects of these numbers on prey populations and the environment.

111.    Under the APA, a reviewing Court shall "hold unlawful and set aside agency action, findings, and conclusions found to be (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law; (B) contrary to constitutional right, power, privilege, or immunity; (C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right; (D) without observance of procedure required by law; (E) unsupported by substantial evidence in a case subject to sections 556 and 557 of this title or otherwise reviewed on the record of an agency hearing provided by statute; or (F) unwarranted by the facts to the extent that the facts are subject to trial de novo by the reviewing court." 5 U.S.C. § 706.

112.    An EIS prepared pursuant to NEPA must "provide a full and fair discussion of significant environmental impacts and shall inform decision makers and the public of reasonable alternatives that would avoid or minimize adverse impacts or enhance the quality of the human environment." 40 C.F.R. § 1502.1.

113.    An EIS prepared pursuant to NEPA must address "(i) reasonably foreseeable environmental effects of the proposed agency action; (ii) any reasonably foreseeable adverse environmental effects which cannot be avoided should the proposal be implemented; (iii) a reasonable range of alternatives to the proposed agency action, including an analysis of any negative environmental impacts of not implementing the proposed agency action in the case of a no action alternative, that are technically and economically feasible, and meet the purpose and need of the proposal; (iv) the relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity; and (v) any irreversible and

irretrievable commitments of Federal resources which would be involved in the proposed agency action should it be implemented." 42 U.S.C. § 4332(2)(C).

114.    The EIS prepared by USFWS contains inadequate and incomplete analyses regarding the protection of the Mexican wolf; and the potential number of wolves on the landscape, the distribution of wolves on the landscape, and the effects of these numbers on prey populations and the environment, in violation of NEPA.

115.    USFWS's failure to develop a NEPA-compliant EIS is an agency action that is arbitrary, capricious, an abuse of discretion, otherwise not in accordance with the law, contrary to the agency's power and/or privilege, in excess of statutory jurisdiction, and without observance of procedure required by law, in violation of the APA.

116.    This Court should declare that USFWS's action violates the APA and NEPA; and enjoin the effectiveness of the EIS and ROD designating the proposed Colorado wolf population as a nonessential, experimental population under 10(j) of the ESA, and the wolf introduction in general, pending USFWS's full and complete compliance with NEPA.

## COUNT II: VIOLATIONS OF THE ADMINISTRATIVE PROCEDURE ACT AND NATIONAL ENVIRONMENTAL POLICY ACT

117.    Plaintiffs reallege and incorporate by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

118.    NEPA requires agencies to "take a 'hard look' at the environmental consequences before taking a major action." *Cure Land, LLC v. United States Department of Agriculture*, 833 F.3d 1223, 1230-31 (10th Cir. 2016) (quoting *Citizens Comm. to Save Our Canyons v. Krueger*, 513 F.3d 1169, 1178 (10th Cir. 2008)).

119.    Under NEPA, "where it is unclear whether a proposed action's environmental effects will significantly affect the quality of the human environment, an agency may prepare an environmental assessment ("EA")." *WildEarth Guardians v. Wehner*, 546 F.Supp.3d 898, 903 (D. Col. 2021) (additional citations omitted). "If the EA leads the agency to conclude that the proposed action will not significantly affect the environment, the agency may issue a finding of no significant impact [FONSI] and proceed with the federal action without further ado." *Id.* (additional citations omitted).

120.    On the other hand, NEPA requires federal agencies to prepare a "detailed statement," known as an EIS, for all "major federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C).

121.    "Major federal actions" requiring the preparation of an EIS include "new and continuing activities, including projects and programs entirely or partially financed, assisted, conducted, regulated, or approved by Federal agencies…" 40 C.F.R. § 1508.1(q)(2). Overall, "major federal actions" are "actions by the federal government…and nonfederal actions with effects that may be major and which are potentially subject to Federal control and responsibility." *Ross v. Federal Highway Admin.*, 162 F.3d 1046, 1051 (10th Cir. 1998) (additional citations omitted).

122.    NEPA mandates that agencies "consider every significant aspect of the environmental impact of a proposed action" and "take a hard look at the environmental consequences **before** taking a major action." *Baltimore Gas and Elec. Co. v. Natural Resources Defense Council, Inc.*, 462 U.S. 87, 97 (1983) (additional citations omitted; internal quotations omitted; emphasis added).

123.    In actions brought under the APA "a few courts have held—without much analysis—that non-federal entities are not proper defendants in an APA case and therefore cannot be enjoined…[b]ut the substantial weight of authority goes the other way." *Zeppelin v. Federal Highway Administration*, 293 F.Supp.3d 1267, 1283 (D. Col. 2017) (additional citations omitted). The Tenth Circuit follows the majority view. *Id.* Under that view, a non-federal entity may be enjoined in an APA case based on a consent theory, meaning that the entity's consent to federal involvement effectively operates as consent to be subjected to federal requirements. *Id.* at 1283-84.

124.    Under the consent theory, the analysis focuses on whether the non-federal entity had "pervasive and long-standing" federal involvement, or whether the non-federal entity had "comparatively little federal involvement." *Id.* at 1284. "Somewhere in between those two poles, a non-federal entity's participation with the federal government becomes irrevocable consent to federal statutory requirements, such as NEPA, which is enforceable through the APA." *Id.*

125.    CPW, Dan Gibbs, and Jeff Davis have and will continue to utilize, rely on, request, and consent to significant and substantial federal involvement in developing and revising the Wolf Restoration and Management Plan, introducing gray wolves in Colorado, and overseeing and implementing gray wolf restoration and management objectives in the state. Federal involvement, primarily from USFWS, has been and will continue to be thorough, pervasive, long-standing, and active.

126.    Based on information and belief, substantial federal resources—including time, money, and effort—have been and will continue to be expended on Colorado's wolf introduction.

CPW has and will continue to utilize, rely on, request, and consent to the expenditure of these federal resources on the state's wolf introduction.

127.    Wolf introduction in Colorado—and the process itself—has been and will continue to be subject to substantial federal control and responsibility.

128.    Wolf introduction in Colorado is a major federal action significantly affecting the quality of the human environment. Environmental impacts that have not been adequately analyzed and addressed (or even analyzed at all) include the potential spread of *Echinococcus canadensis* and its effects on livestock, wildlife, and humans in Colorado; and the potential number of wolves on the landscape, the distribution of wolves on the landscape, and the effects of these numbers on prey populations and the environment.

129.    Neither CPW, Dan Gibbs, Jeff Davis, USFWS, nor any other department, agency, or entity has conducted nor completed the environmental review process required by NEPA for wolf introduction itself, in violation of NEPA and the APA.

130.    This Court should declare Defendants' actions and decisions not to conduct the environmental review process under NEPA prior to introducing wolves in Colorado to violate both NEPA and the APA; and enjoin wolf introduction in Colorado pending Defendants' full and complete compliance with NEPA.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiffs pray for relief as follows:

131.    For a declaratory judgment determining that Defendants have violated and are violating NEPA, the CEQ regulations implementing NEPA, and the APA by failing to prepare a

NEPA-compliant EIS designating the proposed Colorado wolf population as a nonessential, experimental population under 10(j) of the ESA;

132.    For a declaratory judgment determining that Defendants have violated and are violating NEPA, the CEQ regulations implementing NEPA, and the APA by failing to conduct the environmental review process under NEPA for gray wolf introduction itself in Colorado;

133.    For a preliminary and permanent injunction enjoining the effectiveness of the EIS and ROD designating the proposed Colorado wolf population as a nonessential, experimental population under 10(j) of the ESA, and the wolf introduction in general, pending USFWS's full and complete compliance with NEPA;

134.    For a preliminary and permanent injunction enjoining all Defendants from introducing gray wolves in Colorado pending Defendants' full and complete compliance with NEPA by conducting and completing the environmental review process under NEPA and in compliance with all standards under NEPA;

135.    For this Court to retain continuing jurisdiction to review Defendants' compliance with all judgments and orders entered herein;

136.    For an award of Plaintiffs' costs, disbursements, and reasonable attorneys' fees as allowed by law;

137.    For such other and further relief as deemed just, equitable and proper by this Court.

Dated:  December 14, 2023

Respectfully submitted,


*/s/ Meaghan E. Fischer*
Meaghan E. Fischer
Colorado State Bar No. 50069
WEGENER LANE & EVANS, P.C.
1823 Ford Street, Suite 103
Golden, CO 80401
Tel. (303) 835-9599
Fax: (970) 241-5719
Email: meaghan@wlelegal.com

Gary R. Leistico, *Application for the United States*
*District Court of Colorado Pending*
Minnesota State Bar No. 24448X
LEISTICO & ESCH, PLLC
P.O. Box 365
Clear Lake, MN 55319
Direct: (320) 267-6721
Fax: (763) 392-0757
Email: gleistico@leisticoesch.com


ATTORNEYS FOR PLAINTIFFS