### IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF COLORADO

Civil Action No. 1:23-cv-3294-REB

COLORADO CONSERVATION ALLIANCE,
a Colorado Nonprofit Corporation,
CHRISTOPHER JURNEY,
and MICHAEL CLARK,
      Plaintiffs,

v.

UNITED STATES FISH AND WILDLIFE SERVICE,
COLORADO PARKS AND WILDLIFE COMMISSION,
COLORADO DIVISION OF PARKS AND WILDLIFE,
DAN GIBBS, in his official capacity as Executive Director
of the Colorado DEPARTMENT OF NATURAL RESOURCES,
and JEFF DAVIS, in his official capacity as Director of
COLORADO DIVISION OF PARKS AND WILDLIFE.
      Defendants.

---

### PLAINTIFFS' VERIFIED MOTION FOR PRELIMINARY INJUNCTION AND MEMORANDUM IN SUPPORT

---

### <u>INTRODUCTION</u>

Plaintiffs Colorado Conservation Alliance, Inc. ("CCA"), Christopher Jurney, and

Michael Clark ("Plaintiffs") respectfully move this Court for a preliminary injunction under Fed.

R. Civ. P. 65 enjoining the defendants United States Fish and Wildlife Service ("USFWS"),

Colorado Parks and Wildlife Commission, Colorado Division of Parks and Wildlife (collectively,

with the Commission, "CPW"), Dan Gibbs, and Jeff Davis ("Defendants"), and any agents or

employees thereof, from releasing or authorizing the release of any additional wolves in

Colorado.

1

## BACKGROUND

The controversial wolf introduction in Colorado stems from the passage of Proposition 114, which was a ballot measure that generally required CPW to take the steps necessary to reintroduce gray wolves (*Canis lupus*) in Colorado by December 31, 2023. Proposition 114 passed by a narrow margin, with 50.91% of Coloradans voting in favor of the Act and 49.09% of Coloradans opposed. Proposition 114 is currently codified as Section 33-2-105.8 of Colorado Revised Statutes.

Following the approval of Proposition 114, Colorado requested USFWS to designate the proposed gray wolf population in Colorado as a "nonessential, experimental" population under Section 10(j) of the Endangered Species Act ("ESA"). 16 U.S.C. § 1539(j). This was due to the "endangered" status of gray wolves outside the Northern Rocky Mountain and Minnesota populations. *See* U.S. FISH & WILDLIFE SERVICE, *2022 Gray Wolf Questions and Answers*, February 11, 2022, retrieved from: https://www.fws.gov/sites/default/files/documents/2022-Gray-Wolf-FAQs.pdf (last visited December 15, 2023).

Subsequently, on May 3, 2023, CPW passed the final Colorado Wolf Restoration and Management Plan. COLORADO PARKS & WILDLIFE, COLORADO WOLF RESTORATION AND MANAGEMENT PLAN (May 3, 2023) retrieved from: https://cpw.state.co.us/Documents/Wolves /2023-Final-CO-Wolf-Plan.pdf (last visited December 8, 2023) (hereinafter "Wolf Restoration and Management Plan"). The Wolf Restoration and Management Plan contains 9 chapters outlining the steps for reintroduction and management of a gray wolf population in Colorado. *Id.* The plan contemplates the release of 10-15 wolves in the state each year for up to five years. *Id.* The Wolf Restoration and Management Plan contemplates extensive, pervasive, and long-standing federal

involvement and control in the introduction effort. *See e.g.* Compl. at ¶¶ 58-87. Without an adequate 10(j) rule in place, management authority of gray wolves in Colorado would be the responsibility of USFWS.

USFWS released a draft 10(j) rule and draft environmental impact statement ("EIS") in February of 2023. The public was permitted to participate and submit comments on the draft rule and draft EIS from February 17, 2023, to April 18, 2023. Plaintiffs were among the public participants that submitted comments, which addressed deficiencies in the draft EIS. *See e.g.* Dkts. 1-1 (Jurney Decl.) at ¶¶ 16-17; 1-6 (Clark Decl.) at ¶¶ 14-15. USFWS released its final EIS and draft record of decision ("ROD") under NEPA on September 15, 2023, which was published in the Federal Register on September 19, 2023. 88 FR 64399. On November 8, 2023, the final ROD was published in the Federal Register. 88 FR 77014. Accordingly, the 10(j) rule became effective on December 8, 2023, 30 days after publication in the Federal Register. The final ROD provides that USFWS will implement "alternative 1" in the EIS, under which "the Service will approve a section 10(j) rule for the gray wolf population in Colorado, including any gray wolf living in, dispersing into, or reintroduced into the state, providing the Service and its designated agents management flexibility and providing for conservation of the species." *See* USFWS, *Record of Decision, Establishment of a Nonessential Experimental Population of the Gray Wolf (Canis Lupus) in Colorado* (Nov. 7, 2023) at 2, retrieved from https://www.fws.gov/media/final-record-decision-colorado-gray-wolf-10j-rule (last visited December 15, 2023).

In October 2023, CPW announced that it had reached a one-year agreement with the Oregon Department of Fish and Wildlife to trap and transfer up to 10 gray wolves from northeastern Oregon to Colorado. Defendants are now moving forward with trapping and

transferring wolves into the state. Since December 18, 2023, Defendants have released from five-to-ten gray wolves in Colorado.

## ARGUMENT

To obtain a preliminary injunction, the moving party must show: "(1) a likelihood of success on the merits; (2) a likely threat of irreparable harm to the movant; (3) the harm alleged by the movant outweighs any harm to the non-moving party; and (4) an injunction is in the public interest." *Hobby Lobby Stores, Inc. v. Sebelius*, 723 F.3d 1114, 1128 (10th Cir. 2013) (citing *Winter v. NRDC*, 555 U.S. 7, 20 (2008)). As demonstrated below, Plaintiffs satisfy each element.

Further, the Tenth Circuit disfavors "(1) preliminary injunctions that alter the status quo; (2) mandatory preliminary injunctions; and (3) preliminary injunctions that afford the movant all the relief that it could recover at the conclusion of a full trial on the merits." *Fish v. Kobach*, 840 F.3d 710, 723-24 (10th Cir. 2016) (quoting *Awad v. Ziriax*, 670 F.3d 1111, 1125 (10th Cir. 2012)). To be clear, Plaintiffs are not requesting a disfavored injunction. Plaintiffs understand that Defendants have released five-to-ten gray wolves in Colorado since December 18, 2023. Plaintiffs are not asking for any additional relief at this time other than a preliminary injunction stopping any <u>further</u> introductions of wolves in Colorado.

## I.    PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS OF THEIR CLAIMS.

### A. Legal Standard.

Plaintiffs are likely to prevail on the merits of their claims. "Although the courts use a bewildering variety of formulations of the need for showing some likelihood of success, all courts agree that plaintiff must present a prima facie case but need not show a certainty of winning." *Coalition of Concerned Citizens to Make Art Smart v. Federal Transit Administration of U.S.*

*Department of Transportation*, 843 F.3d 886, 901 (10th Cir. 2016) (additional citations omitted; cleaned up). As described below, Plaintiffs make this prima facie case because (1) CPW's failure to complete the environmental review process under NEPA is arbitrary, capricious, an abuse of discretion, otherwise not in accordance with law, and was made without observance of procedure required by law; and (2) The EIS issued by USFWS is deficient under the requirements of NEPA.

Plaintiffs brought this lawsuit under NEPA and the APA. NEPA is designed to "ensure Federal agencies consider the environmental impacts of their actions in the decision-making process." 40 C.F.R. § 1500.1(a). Under NEPA, "where it is unclear whether a proposed action's environmental effects will significantly affect the quality of the human environment, an agency may prepare an environmental assessment ("EA")." *WildEarth Guardians v. Wehner*, 546 F.Supp.3d 898, 903 (D. Colo. 2021) (additional citations omitted). "If the EA leads the agency to conclude that the proposed action will not significantly affect the environment, the agency may issue a finding of no significant impact [FONSI] and proceed with the federal action without further ado." *Id.* (additional citations omitted).

On the other hand, NEPA requires federal agencies to prepare a "detailed statement," known as an EIS, for all "major federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C). "Major federal actions" requiring the preparation of an EIS include "new and continuing activities, including projects and programs entirely or partially financed, assisted, conducted, regulated, or approved by Federal agencies…" 40 C.F.R. § 1508.1(q)(2). Overall, "major federal actions" are "actions by the federal government…and nonfederal actions with effects that may be major and which are potentially subject to Federal

control and responsibility." *Ross v. Federal Highway Admin.*, 162 F.3d 1046, 1051 (10th Cir. 1998) (additional citations omitted).

NEPA requires agencies to "take a 'hard look' at the environmental consequences before taking a major action." *Cure Land, LLC v. United States Department of Agriculture*, 833 F.3d 1223, 1230-31 (10th Cir. 2016) (quoting *Citizens Comm. to Save Our Canyons v. Krueger*, 513 F.3d 1169, 1178 (10th Cir. 2008)). Accordingly, an EIS must "provide a full and fair discussion of significant environmental impacts and shall inform decision makers and the public of reasonable alternatives that would avoid or minimize adverse impacts or enhance the quality of the human environment." 40 C.F.R. § 1502.1. Importantly, "[w]hile a federal agency is entitled to a presumption of regularity in arriving at its decision, the court is not simply a 'rubber stamp' for agency action and will set aside agency action if it is in contravention of the agency's own rules or congressional mandate…In other words, the court will not accept *pro forma* compliance with NEPA procedures, nor post hoc rationalizations as to why and how the agency complied with NEPA." *International Snowmobile Mfrs. Ass'n v. Norton*, 340 F.Supp.2d 1249, 1258 (D. Wyo. 2004) (additional citations omitted). Significantly, "[a]n agency must set forth a reasoned explanation for its decision and cannot simply assert that its decision will have an insignificant effect on the environment." *Marble Mountain Audubon Soc. v. Rice*, 914 F.2d 179, 182 (9th Cir. 1990) (citing *Jones v. Gordon*, 792 F.2d 821, 828 (9th Cir. 1986)).

Because NEPA provides no private cause of action, NEPA challenges arise under the APA, and Courts review an agency's NEPA compliance "to see whether it is 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'" *New Mexico ex rel. Richardson v. Bureau of Land Management*, 565 F.3d 683, 704 (10th Cir. 2009) (quoting 5 U.S.C. § 706(2)(a)).

"An agency's decision is arbitrary and capricious if the agency (1) 'entirely failed to consider an important aspect of the problem,' (2) 'offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise,' (3) 'failed to base its decision on consideration of the relevant factors,' or (4) made 'a clear error of judgment.'" *New Mexico ex rel. Richardson*, 565 F.3d at 704 (quoting *Utah Envtl. Cong. v. Troyer*, 479 F.3d 1269, 1280 (10th Cir. 2007)). The APA similarly provides that a reviewing Court will hold unlawful and set aside agency action(s) that are made "without observance of procedure required by law." 5 U.S.C. § 706.

**B. CPW and the state defendants have consented to federal statutory requirements, and this Court should enjoin any further introduction of wolves pending their full compliance with the environmental review process required by NEPA.**

First, in this case, a non-federal entity may subject itself to federal statutory requirements— such as NEPA and the APA—when it consents to a higher level of federal involvement in a project. For instance, in *Zeppelin v. Federal Highway Administration*, the Court addressed whether a state agency—the Colorado Department of Transportation ("CDOT")—was a proper defendant in a case alleging violations of NEPA and the APA. 293 F.Supp.3d 1267 (D. Colo. 2017). In this case, a group of Plaintiffs sued the Federal Highway Administration ("FHA") and CDOT to stop them from tearing down and rebuilding a viaduct. *Id.* at 1269. The project required approval from the FHA, and FHA funded portions of the project, so FHA prepared an EIS addressing the proposed project. *Id.* The Plaintiffs sued both FHA and CDOT, alleging that the EIS was deficient because it unlawfully excluded full consideration of a major stormwater project being pursued by the City and County of Denver. *Id.*

In addressing whether CDOT—a state agency—was a proper defendant in the case, the Court determined that a non-federal entity may be enjoined in an APA case based on a "consent theory." *Id.* at 1284. That is, if the non-federal entity accepts federal funding or participates in a federal process, it may be fairly subjected to federal requirements. *Id.* In justifying its reasoning, the Court distinguished a case where there was "comparatively little federal involvement" to one where federal involvement was "pervasive and long-standing." *Id.* "Somewhere in between those two poles, a non-federal entity's participation with the federal government becomes irrevocable consent to federal statutory requirements, such as NEPA, which is enforceable through the APA." *Id.* Applying this rationale, the Court determined that it had the power to enjoin CDOT from further work on the viaduct project given its "thorough, long-standing, and active consent to federal involvement, and its request for federal funds." *Id.* at 1285.

Similarly, in *Ross v. Federal Highway Administration*, the Tenth Circuit determined that a state's highway construction project was a "major federal action" requiring the state to comply with NEPA where the state received federal funding and significant federal participation in the project. 162 F.3d 1046, 1053 (10th Cir. 1998). In *Ross*, the Kansas Department of Transportation ("KDOT") asked the FHA to segment the highway construction project into four pieces (three western pieces and an eastern piece) and submitted a supplemental EIS for each. *Id.* at 1049-50. While the three western pieces of the project were approved, the SEIS for the eastern piece stalled. *Id.* at 1050. Out of frustration, the state declared that the eastern piece of the project would be a state project (completed without the use of federal funds) and proceeded towards construction. *Id.* After environmental Plaintiffs brought an action challenging the decision, the Court halted the state's construction, holding that the state cannot "withdraw a portion of the project from federal

funding consideration with the resulting effect of avoiding compliance with federal environmental laws." *Id.* at 1053. Accordingly, the Court affirmed the district court's injunction against the state from taking further action on the highway construction project without conducting further environmental review. *Id.* at 1050, 1055.

In this case, similar to *Zeppelin* and *Ross*, CPW and the state defendants have subjected themselves to federal statutory requirements—such as NEPA and the APA—through the long-standing, active, and pervasive federal involvement in the wolf introduction effort. As described in paragraphs 58-87 of Plaintiffs' Complaint, CPW has warranted in multiple sources that it has had and will continue to have significant, substantial, long-standing, and active federal involvement (primarily from USFWS) in the introduction effort. *See* Compl. at ¶¶ 58-87. From a broad standpoint, CPW explains that "close coordination with USFWS has occurred throughout the [Wolf Restoration and Management] Plan development process and will necessarily continue through the implementation stages" (Wolf Restoration and Management Plan at 6) and "CPW has been in communication with USFWS regarding wolf management from the outset of this restoration and management planning effort." COLORADO PARKS AND WILDLIFE, *Wolf Management*, https://cpw.state.co.us/learn/Pages/CON-Wolf-Management.aspx.

In terms of specific federal actions (to summarize), CPW has warranted that it will collaborate with federal agencies on public land issues related to wolf management; CPW will work with USFWS to coordinate monitoring activities; lethal control of wolves will be conducted by both state and federal agents; removal of denning packs will be conducted by state and federal agents; lethal and non-lethal take will be conducted by state and federal agents; investigations related to wolf takes will be conducted by state and federal agents; federal agencies and CPW will

coordinate on land issues as they relate to wolf management, including recreation, gazing management, public access, and/or habitat manipulation; ongoing and future monitoring and research efforts will likely be conducted in collaboration with other state and federal agencies; federal livestock demonstration funds can be used for livestock loss compensation; APHIS nonlethal funding can be used to support conflict minimization; the Wolf Restoration and Management Plan will be modified and adapted with federal input; and five federal employees were represented on the Technical Working Group that informed development of the Wolf Restoration and Management Plan. Wolf Restoration and Management Plan at iii, 27, 28, 29, 30, 36, 42, 43. Additionally, federal involvement is not limited to USFWS, as CPW has warranted "CPW will continue to coordinate with other agencies and organizations to achieve wolf conservation and management objectives. This will be accomplished by **continuing to use** the expertise of USFWS, the U.S. Department of Agriculture's Wildlife Services Program Animal Plant Health Inspection Service (APHIS), U.S. Forest Service (USFS), Bureau of Land Management (BLM)" and others. *Id.* at iv (emphasis added). Accordingly, based on CPW's and the state defendant's significant, substantial, long-standing, and active federal involvement, they have subjected themselves to federal statutory requirements, including NEPA and the APA. *Zeppelin, supra*; *Ross, supra*.

Moreover, there is no dispute that CPW has not gone through NEPA's environmental review process for wolf introduction itself. While USFWS has issued an EIS—which is deficient itself, as described below—designating Colorado's wolf population as a nonessential, experimental population under Section 10(j) of the ESA, this involves different considerations than

the specific action of introducing an apex predator on a new landscape. USFWS recognized this

in its EIS:

> "[o]ther commenters were concerned about the use of lethal management measures, reintroduction in general, or about the population levels of gray wolf that could be sustained in Colorado. **These issues are outside the scope of the 10(j) rule and this EIS or do not meet the purpose and need for the proposed action as described in section 2.3.3; therefore, they are not analyzed in the EIS.**"

> "Potential changes in the geographic extent of diseases or disease vectors as a result of the presence of gray wolves on the landscape would be a potential consequence of the State's plan to reintroduce wolves and would not be influenced by issuing and implementing the 10(j) rule; **therefore, it is outside the scope of the 10(j) rule and FEIS.**"

> U.S. FISH AND WILDLIFE SERVICE, FINAL ENVIRONMENTAL IMPACT STATEMENT, COLORADO GRAY WOLF 10(J) RULEMAKING, (3-1), (Public Comment and Analysis Report at 104) (September, 2023) (emphasis added) (hereinafter "USFWS EIS").

Accordingly, many significant environmental issues have not been addressed and/or analyzed for

wolf introduction itself. For instance, one issue that has received virtually no analysis by

Defendants is the disease and potential spread of *Echinococcus Canadensis*. *See* Compl. at ¶¶ 104-

105. Wolves can disperse hundreds of miles and establish new populations. Dkt. 1-4 (Cronin Decl.)

at ¶ 10. While wolves infected with this disease can be treated, when released the treated wolves

will commingle with nontreated wolves and ungulates and become infected again, spreading the

disease throughout Colorado. Dkts. 1-2 (Love Decl.) at ¶ 5; 1-5 (Gore Decl.) at ¶ 7.

This disease presents significant potential for infection in livestock, wildlife, and even

humans. *See generally* Dkts. 1-2 (Love Decl.); 1-3 (Steele Decl.); 1-5 (Gore Decl.). Echinococcus

larval tapeworms are consumed by canids (such as wolves and dogs) when consuming infected

ungulates. Dkts. 1-3 (Steele Decl.) at ¶ 6; 1-5 (Gore Decl.) at ¶ 6. The larva mature in the intestine

and release infective eggs which are excreted in the feces of the infected animal. *Id.* These eggs

can spread to the surrounding environment, contaminating vegetation. *Id.* Ungulates ingest these

eggs while they feed on vegetation contaminated from the infected feces. *Id.* Once the egg is ingested by the ungulate, it hatches and extends through the small intestine to migrate to other organs, including the brain, heart, and/or liver. Dkt. 1-5 (Gore Decl.) at ¶ 6. Carnivores ingest the cysts when feeding on the infected ungulate and the biological cycle repeats. *Id.* Livestock infected with the disease may have reduced carcass values; decreased meat, milk, and wool production; and delayed fecundity, growth, and performance. *Id.* at ¶ 8. Effects similar to those observed in livestock are also likely in deer and elk infected with *Echinococcus canadensis*. Dkt. 1-3 (Steele Decl.) at ¶ 9. Humans infected with the disease develop hydatid cysts on internal organs, which produce significant adverse side effects and can lead to death. Dkt. 1-2 (Love Decl.) at ¶ 7. Treatment of humans is prolonged, difficult, and expensive. Dkt. 1-3 (Steele Decl.) at ¶ 10.

This is but one environmental concern that has received virtually no analysis from the Defendants (for example, the word "Echinococcus" only appears twice in the 261-page Wolf Restoration and Management Plan (in Appendix E) and is not the subject of any meaningful analysis). Other major issues include an inadequate analysis of the potential number of wolves on the landscape, the distribution of wolves on the landscape, and the effects of these numbers on prey populations. *See* Cronin Decl. at ¶ 25. It is extremely likely there will be other issues as well not specifically outlined by Plaintiffs, as analyzing each and every issue that needs to be addressed would essentially be requiring Plaintiffs to complete the environmental review process for wolf introduction in lieu of Defendants. CPW and the state defendants have consented to federal statutory requirements, such as NEPA and the APA, based on the active, substantial, pervasive, and long-standing federal involvement in the wolf introduction effort. The decision not to complete the environmental review process required by NEPA—and active efforts to avoid compliance with

NEPA, *see* Wolf Restoration and Management Plan at 22—is arbitrary, capricious, an abuse of discretion, not in accordance with law, and was made without observance of procedure required by law, in violation of the APA. Therefore, Plaintiffs have established a prima facie case of a likelihood of success on the merits.

Finally, Plaintiffs emphasize that if injunctive relief is not granted in this case, it will be increasingly difficult for CPW and the state defendants to comply with NEPA after the introduction of additional wolves. As the Tenth Circuit emphasized in *Forest Guardians v. U.S. Fish and Wildlife Service*, "it is clear that an agency may violate NEPA, and consequently the APA, when it predetermines the result of its environmental analysis." 611 F.3d 692, 714 (10th Cir. 2010). This prohibited "predetermination" occurs "when an agency *irreversibly and irretrievably* commits itself to a plan of action that is dependent upon the NEPA environmental analysis producing a certain outcome, *before* the agency has completed that environmental analysis—which of course is supposed to involve an objective, good faith inquiry into the environmental consequences of the agency's proposed action." *Id.* (additional citations omitted).

Defendants released five wolves in Colorado on December 18, 2023, and in reliance on information from attorneys Lisa Reynolds and Christopher G. Breidenbach (*see* page 31 of this memorandum), Plaintiffs understand that up to an additional five wolves have been released by Defendants, without conducting the environmental review required by NEPA for the introduction itself. Defendants have been driven by the deadlines established in Proposition 114, which requires a certain result for an action that has never been completed before (a state initiative to introduce an endangered species on its landscape). However, Defendants' actions already—and dangerously—show a commitment to a plan of action before an environmental analysis under

NEPA has been completed. For instance, an EIS prepared under NEPA must consider the alternative of taking "no action." 40 C.F.R. § 1502.14; 42 U.S.C. § 4332. Regarding wolf introduction itself, the "no action" alternative would be not introducing wolves. If the Defendants continue to introduce wolves without first going through the environmental review process required by NEPA, it is increasingly likely that they will have "irreversibly and irretrievably" committed themselves to a plan of action before completing the environmental analysis under NEPA, in violation of NEPA and the APA, if they have not done so already.

### C. The EIS issued by USFWS is deficient under the requirements of NEPA, and this Court should enjoin any further introduction of wolves pending USFWS's full compliance with NEPA.

Second, in cases under NEPA and the APA, Courts have held that EISs which propose and rely on future determinations and assert conclusions without meaningful analyses are deficient under the requirements of NEPA. For instance, in *Southeast Alaska Conservation Council v. United States Forest Service*, the Court held that an EIS prepared by the United States Forest Service ("USFS") regarding timber harvests and resource management activities on Prince of Whales Island in the Tongass National Forest over a 15-year period was deficient under NEPA. 443 F.Supp.3d 995 (D. Ak. 2020). In so holding, the Court emphasized that "the EIS expressly leaves site-specific determinations about the actual location of timber harvest…for future determination," the EIS's "omission of the actual location of proposed timber harvest and road construction within the project area falls short of [NEPA requirements]," and the EIS did not include determinations and/or even estimates of where and when harvesting and harvest activities would occur. *Id.* at 1005-15 ("the Project EIS at issue here does not approach this level of specificity; it does not delineate harvest units, let alone identify planned activities within them and describe their impacts

on localized cognizable values. Nor does the Project EIS allow the public to identify where specific harvest activities will occur in relation to various cognizable values on Prince of Wales Island."). The Court ended its analysis by highlighting that "NEPA favors coherent and comprehensive up-front environmental analysis to ensure…that the agency will not act on incomplete information, only to request its decision after it is too late to correct." *Id.* at 1015 (additional citations and quotations omitted).

Moreover, in *Marble Mountain Audubon Soc. v. Rice*, environmental plaintiffs appealed a grant of summary judgment in favor of the USFS regarding a fire recovery timber sale. 914 F.2d 179 (9th Cir. 1990). USFS prepared an EIS for the sale, and the plaintiffs challenged the EIS on the grounds that it failed to adequately consider the unique value of certain drainage as the only significant biological corridor between two wilderness areas. *Id.* at 180-81. The Court explained that the EIS "examined the adverse environmental effects which would result from pursuing an intensive timber management policy. Fish and wildlife concerns, however, received only cursory attention. The EIS merely states that timber practices will be modified where necessary to protect the habitat of species that are rare, endangered, or threatened." *Id.* at 180. Accordingly, the Court reversed and remanded, holding that "[a]lthough the FEIS acknowledges that the Grider drainage is a biological corridor, it does not contain a significant discussion of the corridor issue. Instead, the FEIS concludes, without any apparent study or supporting documentation, that the preservation of a ½-mile wide strip bisecting the drainage will be sufficient to maintain the corridor." *Id.* at 182.

The EIS supporting the 10(j) designation prepared by USFWS in this case involves similar deficiencies as those in *Southeast Alaska* and *Marble Mountain*. Notably, with regard to the protection of the Mexican gray wolf, the EIS relies on future actions/determinations and asserts

conclusions without meaningful analyses. USFWS recognizes the Mexican wolf as a distinct subspecies from the northern gray wolf and manages them accordingly. Dkt. 1-4 (Cronin Decl.) at ¶ 14. The Mexican wolf is an endangered species outside of its experimental population boundary and take of Mexican wolves is generally prohibited in its population boundary. 63 FR 1752; 80 FR 2488; 80 FR 2512; 50 C.F.R. § 17.84. In its EIS, USFWS found that northern wolves introduced in Colorado should not be allowed to disperse and interbreed with Mexican wolves in Arizona and New Mexico. *Id.* at ¶ 16. USFWS warrants that they should "minimize interactions and protect the genetic integrity of Mexican wolves." *See* USFWS EIS at 4-39. Specifically, the EIS provides:

> "To support Mexican wolf recovery, the Service is working with CPW and neighboring states to address management of wolves should the wolves expand outside Colorado toward the range of the Mexican wolf. Any take of gray wolves that expand outside Colorado will be addressed through one 10(a)(1)(A) permit in support of a memorandum of understanding between the neighboring states and the state of Colorado. The Service will be a signatory to this memorandum of understanding. These efforts are part of the Mexican wolf recovery that will minimize interactions and protect the genetic integrity of the Mexican wolves. The Service's simultaneous issuance of a 10(a)(1)(A) permit to be held by the service is a separate action, authorizing state, federal, and tribal partners to assist in the capture and return of wolves originating from the Colorado experimental population."

> *Id.*

However, the memorandum of understanding with neighboring states has not been established, and a detailed plan for protecting the Mexican wolf is not presented. *See* Dkt. 1-4 (Cronin Decl.) at ¶ 19. This is a conclusory analysis that relies on uncertain, future determinations in violation of NEPA and the APA. *Southeast Alaska, supra*; *Marble Mountain, supra*. A member of the public has no way of knowing, for instance, what "working with CPW and neighboring states" consists of, when the memorandum of understanding will be established, how long it will take to "work with" CPW and neighboring states to address these issues, how long it will take to

establish a memorandum of understanding, what the memorandum of understanding will consist of, and what the result is if USFWS, CPW, and neighboring states do not "work with" each other and establish a memorandum of understanding (especially if gray wolves are migrating into Mexican wolf territory).

Defendants are taking and transporting gray wolves from Oregon and moving them *hundreds of miles* closer to the Mexican wolf population boundary. Moreover, wolves themselves can disperse hundreds of miles and establish new populations. Dkt. 1-4 (Cronin Decl.) at ¶ 10. The EIS, however, does not present a specific plan to protect the Mexican wolf; outline *how* the plan will work; and does not demonstrate that the plan *will* work to protect the Mexican wolf. Rather, the EIS simply concludes, with little-to-no meaningful analysis, that this 'plan to have a plan' will be sufficient. This is a deficient and conclusory analysis that relies on future determinations in violation of NEPA and the APA and does not secure the protection of the Mexican wolf. At present, USFWS, Colorado, and neighboring states do not have the requisite mechanisms in place to address these issues, and there is no way to definitively determine whether and/or when they *would be* prepared to address these issues. Additionally, the EIS itself presents an inadequate analysis of the potential number of wolves on the landscape, the distribution of wolves on the landscape, and the effects of these numbers on prey populations. *See* Dkt. 1-4 (Cronin Decl.) at ¶ 25. USFWS admits in its EIS that "[d]evelopment of this 10(j) rule is considered a major federal action requiring review under [NEPA]," and the EIS is deficient under the requirements of NEPA. USFWS EIS at (i). Therefore, Plaintiffs have established a prima facie case of a likelihood of success on the merits.

## II.   PLAINTIFFS WILL SUFFER IRREPARABLE HARM IF THE COURT DOES NOT GRANT AN INJUNCTION.

Next, to obtain a preliminary injunction, the moving parties "must establish…that [they are] likely to suffer irreparable harm in the absence of preliminary relief." *Winter v. Natural Resources Defense Counsel, Inc.*, 555 U.S. 7, 20 (2008). "To constitute irreparable harm, an injury must be certain, great, actual 'and not theoretical.'" *Heideman v. South Salt Lake City*, 348 F.3d 1182, 1189 (10th Cir. 2003) (quoting *Wisconsin Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985)). The "irreparable harm requirement is met if a plaintiff demonstrates a significant risk that he or she will experience harm that cannot be compensated after the fact by monetary damages." *Greater Yellowstone Coalition v. Flowers*, 321 F.3d 1250, 1258 (10th Cir. 2003) (quoting *Adams v. Freedom Forge Corp.*, 204 F.3d 475, 484-85 (3rd Cir. 2000) (emphasis in original)).

The United States Supreme Court has recognized that "[e]nvironmental injury, by its nature, can seldom be adequately remedied by money damages and is often permanent or at least of long lasting duration, *i.e.*, irreparable." *Amoco Production Co. v. Village of Gambell, AK*, 480 U.S. 531, 545 (1987). "An agency's failure to follow the National Environmental Policy Act's prescribed procedures creates a risk that serious environmental consequences of the agency action will not be brought to the agency decisionmaker's attention. The injury of an increased risk of harm due to an agency's uninformed decision is precisely the type of injury the National Environmental Policy Act was designed to prevent." *Committee to Save the Rio Hondo v. Lucero*, 102 F.3d 445, 448-49 (10th Cir. 1996). "When a decision to which NEPA obligations attach is made without the informed environmental consideration that NEPA requires, the harm that NEPA intends to prevent has been suffered." *Colorado Wild Inc. v. U.S. Forest Service*, 523 F.Supp.2d 1213, 1219 (D. Colo. 2007) (quoting Sierra *Club v. Marsh*, 872 F.2d 497, 500 (1st Cir. 1989)). "This harm is considered harm to the environment because the risk implied by a violation of NEPA

is that real environmental harm will occur through inadequate foresight and deliberation by the acting federal agency." *Colorado Wild Inc. v. U.S. Forest Service*, 523 F.Supp.2d 1213, 1219 (D. Colo. 2007) (quoting *Catron Cty. Bd. of Commissioners v. United States Fish & Wildlife Serv.*, 75 F.3d 1429, 1433 (10th Cir. 1996) (internal quotations omitted)).

For instance, in *Colorado Wild Inc. v. U.S. Forest Service*, the District Court discussed the premise of the "biased" NEPA process. 523 F.Supp.2d 1213 (D. Colo. 2007); *see also Indigenous Environmental Network v. United States Department of State*, 369 F.Supp.3d 1045, 1049 (D. Mont. 2018). In *Colorado Wild, Inc.*, a private company applied to the United States Forest Service for rights-of-way across Forest Service lands to access private land owned by the company. *Id.* at 1216. In response to the application, the Forest Service prepared an EIS and selected an alternative—implemented through the corresponding ROD—that allowed construction on Forest Service roads. *Id.* at 1218. The plaintiffs filed suit, the Court granted a TRO prohibiting the Forest Service from authorizing the construction, and later granted a preliminary injunction. *Id.* at 1219, 1231. In its analysis of irreparable harm, the Court reasoned that the construction not only involved a ground-breaking activity, but also the risk that the required NEPA analysis would be biased by "bureaucratic momentum" if construction was allowed to commence. *Id.* at 1221. "Thus, the irreparable injury threatened here is not simply whatever ground-disturbing activities are conducted in the relatively short interim before this action is decided, it is the risk that in the event the Forest Service's FEIS and ROD are overturned and the agency is required to "redecide" the access issue, the bureaucratic momentum created by Defendants' activities will skew the analysis and decision-making of the Forest Service towards its original, non-NEPA compliant access decision." *Id.*

In this case, Plaintiffs are individuals and an organization who have substantial interests—including recreational, aesthetic, cultural, social, professional, and economic—in protecting wildlife populations, sustainably using wildlife resources, protecting the environment for wildlife populations, protecting livestock, and protecting interests related to hunting, fishing, farming, ranching, and recreation, as Plaintiffs are made up of individuals who ranch, farm, raise and produce livestock, hunt, fish, trap, and otherwise recreate in the state. *See* Compl. at ¶¶ 15-17; *See generally* Dkt. 1-1 (Jurney Decl.); 1-6 (Clark Decl.). Plaintiffs will suffer irreparable harm in the absence of an injunction.

First, Plaintiffs have already been harmed by Defendants' failure to comply with NEPA for the EIS and accompanying ROD issued for the 10(j) rule, and Defendants' failure to conduct the analysis required by NEPA for the introduction itself. This is an environmental harm that specifically occurs when agencies fail to comply with NEPA. *See e.g. Colorado Wild Inc. v. U.S. Forest Service*, 523 F.Supp.2d 1213, 1219 (D. Colo. 2007) (quoting Sierra *Club v. Marsh*, 872 F.2d 497, 500 (1st Cir. 1989)) ("[w]hen a decision to which NEPA obligations attach is made without the informed environmental consideration that NEPA requires, the harm that NEPA intends to prevent has been suffered."). Accordingly, allowing any additional introduction of wolves to proceed in Colorado—the result if this Court does not grant Plaintiffs' request for an injunction—will make this harm irreparable. As this Court recognized in *Colorado Wild Inc.*, if this Court allows wolf introduction to continue in light of the risk that USFWS's EIS and ROD are overturned, and CPW (in conjunction with other defendants) is ordered to complete the environmental review required by NEPA, there is a significant risk that bureaucratic momentum

will bias the review process in favor of the decisions that were made in violation of NEPA. This, in and of itself, constitutes sufficient irreparable harm to warrant an injunction.

Second, irreparable harm will occur to the Mexican Gray Wolf population and Plaintiffs' interests if introduction is allowed to proceed under the EIS and ROD issued by USFWS. As explained in the first section of this brief, USFWS recognizes the Mexican wolf as a distinct subspecies from the northern gray wolf and manages them accordingly. Dkt. 1-4 (Cronin Decl.) at ¶ 14. The Mexican wolf is an endangered species outside of its experimental population boundary and take of Mexican wolves is generally prohibited in its population boundary. 63 FR 1752; 80 FR 2488; 80 FR 2512; 50 C.F.R. § 17.84. In its EIS, USFWS found that northern wolves introduced in Colorado should not be allowed to disperse and interbreed with Mexican wolves in Arizona and New Mexico. *Id.* at ¶ 16. USFWS warrants that they should "minimize interactions and protect the genetic integrity of Mexican wolves." *See* USFWS EIS at 4-39. Again, the EIS provides:

> "To support Mexican wolf recovery, the Service is working with CPW and neighboring states to address management of wolves should the wolves expand outside Colorado toward the range of the Mexican wolf. Any take of gray wolves that expand outside Colorado will be addressed through one 10(a)(1)(A) permit in support of a memorandum of understanding between the neighboring states and the state of Colorado. The Service will be a signatory to this memorandum of understanding. These efforts are part of the Mexican wolf recovery that will minimize interactions and protect the genetic integrity of the Mexican wolves. The Service's simultaneous issuance of a 10(a)(1)(A) permit to be held by the service is a separate action, authorizing state, federal, and tribal partners to assist in the capture and return of wolves originating from the Colorado experimental population."

> *Id.*

However, the memorandum of understanding with neighboring states has not been established, and a detailed plan for protecting the Mexican wolf is not presented. Dkt. 1-4 (Cronin Decl.) at ¶ 19. Even without the introduction in Colorado, northern gray wolves have already

dispersed into Arizona and New Mexico. *Id.* at ¶ 19. Now, Defendants are taking gray wolves from Oregon and moving them *hundreds of miles* closer to the population boundary of the Mexican Wolf. When the memorandum of understanding with neighboring states has not been established, a detailed plan for protecting the Mexican wolf is not presented, and wolves can disperse and travel significant distances and establish new populations, there is a significant and immediate risk that the protection of the Mexican wolf will be compromised absent an injunction. The EIS does not present a specific plan to protect the Mexican wolf; outline *how* the plan will work; and does not demonstrate that the plan *will even* work.

This risk will be significantly intensified with additional wolves on the landscape. There is no way to discern how long it would take for USFWS and Colorado to establish these memorandums and agreements with neighboring states and secure the proper permitting to ensure the Mexican wolf and northern gray wolves do not interbreed and compete, because the EIS does not address *how and/or when* this will be accomplished. At present, USFWS, Colorado, and neighboring states do not have the requisite mechanisms in place to address these issues, and there is no way to determine whether and/or when they *would be* prepared to address these issues (and if such a plan *can* even address these issues). This further results in a significant, immediate, and irreparable harm sufficient to warrant an injunction in this case.

Third, Plaintiffs interests will be irreparably harmed without an injunction because additional wolves introduced in Colorado will also begin depredating wildlife, depredating livestock, and spreading disease. These risks will be exacerbated by the presence of additional wolves. As ranchers, farmers, livestock producers, and outfitters, Plaintiffs' economic interests will be substantially and irreparably harmed when wolves begin depredating livestock and big game

throughout Colorado. *See generally* Dkt. 1-1 (Jurney Decl.); 1-6 (Clark Decl.). Plaintiffs' recreational and aesthetic interests will similarly be harmed when wolves begin depredating wildlife. *Id.* Neither the Wolf Restoration and Management Plan nor the USFWS EIS sufficiently analyze the amount of wolves that will eventually occupy Colorado and the numbers of prey they will kill. Dkt. 1-4 (Cronin Decl.) at ¶¶ 24-27. The amount of depredation and its effects are therefore unknown, which presents a significant and substantial risk of irreparable injury to prey populations and Plaintiffs' interests.

Moreover, and significantly, additional, and irreparable injury will occur to Plaintiffs' interests (and, potentially, Plaintiffs themselves) when gray wolves introduced in Colorado begin to spread disease. As noted, one disease that has received virtually no analysis by Defendants is *Echinococcus Canadensis*. *See* Compl. at ¶¶ 104-105. While wolves infected with this disease can be treated, when released the treated wolves will commingle with nontreated wolves and ungulates and become infected again, spreading the disease throughout Colorado. Dkt. 1-2 (Love Decl.) at ¶ 5; 1-5 (Gore Decl.) at ¶ 7.

Wolves can disperse hundreds of miles and establish new populations. Dkt. 1-4 (Cronin Decl.) at ¶ 10. This disease presents significant potential for infection in livestock, wildlife, and even humans. *See generally* Dkts. 1-2 (Love Decl.); 1-3 (Steele Decl.); 1-5 (Gore Decl.) As noted, *Echinococcus canadensis* is spread in the feces of canids (such as wolves), and wolves introduced in Colorado will immediately begin excreting feces upon introduction. Again, these risks will be significantly intensified with even more wolves on the landscape. Even if these wolves are treated beforehand, interaction with an infected canid or consumption of an infected ungulate would—absent an irregularity—immediately infect these wolves and the disease will begin spreading. An

infected wolf excreting feces throughout dispersal—when dispersal can include hundreds of miles of territory—will spread the disease dramatically. Even if the Court were to later order Defendants to pick up the wolves (pending compliance with NEPA), infected feces would still exist throughout the landscape, creating a significant risk of infection in livestock, wildlife, and even humans. Again, this further results in significant, immediate, and irreparable harm sufficient to warrant an injunction in this case.

Finally, Plaintiffs anticipate that Defendants will argue that the 'delay' in filing the lawsuit and seeking a preliminary injunction weighs against a finding of irreparable harm, because the ballot measure authorizing the introduction of the gray wolf passed in 2020. This is not the case. USFWS released its final EIS on September 15, 2023, which was not published in the Federal Register until September 19, 2023. 88 FR 64399. The ROD implementing the EIS was not published in the Federal Register until November 8, 2023, and it did not become effective until December 8, 2023. 88 FR 77014. Plaintiffs undertook a thorough review of the 389-page EIS document with experts before filing suit to determine what issues were addressed in the EIS and whether the EIS covered the predominant issues related to the species designation and the introduction itself. Plaintiffs could not be aware of what the final EIS addressed beforehand because it was not published, the draft EIS was subject to change, and final agency action did not occur until December 8, 2023. In addition to ripeness issues (e.g. filing suit before the ROD implementing the EIS was final), this Court should not find any 'delay' on the part of Plaintiffs. Doing so would incentivize litigants analyzing an EIS to simply file a lawsuit and figure out the issues later—in an already overcrowded judicial system—rather than undertaking a thorough review of an EIS to determine whether a lawsuit is necessary. Accordingly, for the aforementioned

reasons, this Court should find that Plaintiffs will suffer irreparable harm in the absence of an injunction.

### III.      THE BALANCE OF HARMS FAVORS AN INJUNCTION.

"To obtain a preliminary injunction, the movant must [also] show [that]...the threatened injury outweighs the harms that the preliminary injunction may cause the opposing party." *Williams v. Sonnentag*, No. 1:21-CV-02757-RMR, 2021 WL 5198101, at *14 (D. Colo. Nov. 9, 2021) (citing *Aposhian v. Barr*, 958 F.3d 969, 978 (10th Cir. 2020). In the related *Gunnison County* case filed by the Gunnison County Stockgrowers' Association, Inc. and the Colorado Cattlemen's Association, Judge Rodriguez stated that "[h]arm befalls the public 'any time a State is enjoined by a court from effectuating statutes enacted by representatives of its people.'" 2023 WL 8702078, at *7 (quoting *Maryland v. King*, 567 U.S. 1301, 1303 (2012)). Judge Rodriguez therefore reasoned that an "injunction to prevent the reintroduction of wolves would thus prevent CPW from effectuating its statutory mandate to reintroduce wolves before the end of 2023, exposing it to potential liability." *Id*.

Plaintiffs respectfully note that Proposition 114, C.R.S. 33-2-105.8 does not require CPW to *release* wolves by 2023. Rather, it requires CPW to "[t]ake the steps necessary to begin reintroductions of gray wolves." Plaintiffs believe CPW took steps necessary to begin the reintroduction of gray wolves prior to the December 18th release of wolves by formulating the Colorado Wolf Restoration and Management Plan (the "Plan") and asking FWS to promulgate a rule under section 10(j) of the ESA. While Plaintiffs believe the steps CPW and USFWS took were not sufficient under NEPA to actually release wolves into Colorado, CPW nevertheless took certain steps necessary to begin reintroduction of gray wolves and therefore fulfilled its obligation under

Proposition 114 prior to the actual release of wolves. Notwithstanding, however, if the Court agrees with Judge Rodriguez that Proposition 114 requires the release of gray wolves by the end of the year, Defendants did so on December 18th and has accordingly carried out the will of the Colorado voters. There is thus no harm to the public if Defendants are enjoined from releasing additional wolves pending resolution of this case.

Of equal importance, Proposition 114 does not and cannot exempt the state from compliance with other applicable statutes enacted by the representatives of its people, like NEPA. CPW and USFWS have an obligation independent of any referendum to comply with all applicable laws. "The public has an undeniable interest in the [agency's] compliance with NEPA's environmental review requirements and the informed decision-making that NEPA is designed to promote." *Colorado Wild Inc. v. U.S. Forest Serv.*, 523 F. Supp. 2d 1213, 1223 (D. Colo. 2007). There is a strong public interest in the "careful consideration of environmental impacts before major federal projects go forward," and courts have found that "suspending such projects until that consideration occurs comports with the public interest." *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1138 (9th Cir. 2011) (internal quotation marks omitted). The Tenth Circuit has "consistently identified the strong public interest in the enforcement of NEPA." *Coal. of Concerned Citizens To Make Art Smart v. Fed. Transit Admin. of U.S. Dep't of Transportation*, 843 F.3d 886, 915 (10th Cir. 2016).

Here, there was no NEPA analysis of the actual introduction of wolves in Colorado. The EIS states:

**[C]onsidering an alternative to not pursue active wolf reintroduction efforts is outside the Service's legal authority and outside the scope of the EIS.**

*Id*. at section 1.7.1. USFWS therefore assumed that wolves will be introduced in Colorado and thus only evaluated alternate management frameworks. It did not evaluate the reintroduction itself. The Colorado Wolf Restoration and Management Plan also blatantly states that wolves will not be released on federal lands in an attempt to avoid NEPA compliance "because CPW does not have the staffing or financial resources to undertake the required National Environmental Policy Act (NEPA) analysis." *Id*. at 22.

While the majority of voters may have voted in favor of Proposition 114, the approval of this referendum does not in any way exempt the CPW or USFWS from compliance with applicable federal laws, and, here the EIS did not evaluate the introduction itself and did not sufficiently analyze other important matters like *Echinococcus canadensis*, compromises to Mexican wolves, and population management plans, which could cause significant harm to the public, wildlife and environment in the state. *See* Dkts. 1-2 (Love Decl.), 1-3 (Steele Decl.), 1-4 (Cronin Decl.), 1-5 (Gore Decl.).

Finally, Plaintiffs note that their request to enjoin Defendants from introducing any more wolves in the State is not a disfavored injunction because it does not alter the status quo, is not a mandatory injunction (as opposed to prohibitory) and does not afford the movant all the relief it could otherwise recover at the conclusion of the case on its merits. *See Fish v. Kobach*, 840 F.3d 710, 723-24 (10th Cir. 2016). The balance of harms therefore weighs in favor of enjoining the introduction of any more wolves in Colorado to ensure adequate NEPA analysis.

## IV.    THE PUBLIC INTEREST FAVORS AN INJUNCTION.

An injunction stopping the introduction of any additional wolves in Colorado, if issued, will not adversely affect the public interest. In *Gunnison County*, Judge Rodriguez found that

plaintiffs' request for a preliminary injunction was against the public interest because voters passed Proposition 114, and halting the release of wolves would "enjoin CPW from carrying out the will of Colorado voters." 2023 WL 8702078, at *8. As discussed *supra*, Plaintiffs respectfully believe CPW took necessary steps prior to the release of wolves to fulfill its obligation in Proposition 114. Notwithstanding, however, if the Court agrees with Judge Rodriguez that Proposition 114 requires the release of gray wolves by the end of the year, CPW did so on December 18th and has accordingly carried out the will of the Colorado voters. The public's interest, as it pertains to Proposition 114, has thus been fulfilled.

Plaintiffs, and the public, have an equally strong interest now in ensuring Defendants properly complied with NEPA and to prevent the release of additional gray wolves if Defendants failed to take a "hard look" at environmental consequences. As heavily stressed in the Declarations of Dan Love, Dick Steele, Matthew Cronin, and Melvin Gore, there are a number of issues—like *Echinococcus canadensis*, compromises to Mexican wolves, and population management plans, which the CPW's Plan and the EIS do not sufficiently address, that could cause significant harm to the public, the environment and wildlife in the state. *See* Dkts. 1-2 (Love Decl.), 1-3 (Steele Decl.), 1-4 (Cronin Decl.), 1-5 (Gore Decl.). In addition, the EIS assumes that wolves will be introduced and thus did not evaluate the reintroduction of wolves itself. Still further, CPW admits it drafted the Plan in such a manner to attempt to avoid NEPA analysis. The public interest weighs in favor of CPW and USFWS properly taking a hard look at introduction of wolves and properly analyzing other issues that could significantly impact the people, wildlife, and environment. The Court should accordingly issue a preliminary injunction stopping Defendants from introducing any more wolves in the State pending resolution of this case.

**V.     THIS COURT SHOULD NOT IMPOSE A BOND, OR ONLY REQUIRE A NOMINAL BOND.**

Finally, if the Court enters a preliminary injunction, Plaintiffs respectfully request that this Court waive the bond requirement or impose a nominal bond under Fed. R. Civ. P. 65(c). In actions where, as here, Plaintiffs seek to advance the public interest by and through the enforcement of environmental laws, Courts in the Tenth Circuit routinely waive the bond requirement or only impose a nominal bond. *See e.g. Colorado Wild Inc. v. U.S. Forest Service*, 523 F.Supp.2d 1213, 1230-31 (D. Colo. 2007). Plaintiffs are a non-profit organization and two individuals seeking to vindicate the public interest served by NEPA. A substantial bond would likely preclude Plaintiffs from pursuing their environmental claims further.

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request this Court to grant their Motion for a Preliminary Injunction.

Dated:  December 22, 2023.                           Respectfully submitted,


                                                    */s/ Gary R. Leistico*
                                                    Gary R. Leistico
                                                    Minnesota State Bar No. 24448X, *Admitted in the U.S. District Court for the District of Colorado*
                                                    LEISTICO & ESCH, PLLC
                                                    P.O. Box 365
                                                    Clear Lake, MN 55319
                                                    Direct: (320) 267-6721
                                                    Fax: (763) 392-0757
                                                    Email: gleistico@leisticoesch.com

*/s/ Meaghan E. Fischer*
Meaghan E. Fischer
Colorado State Bar No. 50069
WEGENER LANE & EVANS, P.C.
1823 Ford Street, Suite 103
Golden, CO 80401
Tel. (303) 835-9599
Fax: (970) 241-5719
Email: meaghan@wlelegal.com

ATTORNEYS FOR PLAINTIFFS

## CERTIFICATION OF COMPLIANCE WITH DUTY TO CONFER

Pursuant to D.C.Colo.L.Civ.R. 7.1 counsel for Plaintiffs spoke with Attorneys Lisa A. Reynolds and Christopher G. Breidenbach by telephone on December 21, 2023. Lisa A. Reynolds and Christopher G. Breidenbach represent defendants Colorado Parks and Wildlife Commission, Colorado Division of Parks and Wildlife, Dan Gibbs, and Jeff Davis (the "state defendants"). Counsel for Plaintiffs informed counsel for state defendants they were prepared to move for a temporary restraining order in addition to the preliminary injunction. Counsel for the state defendants, however, assured Plaintiffs that—other than one additional wolf that was already released or would be released very shortly—the state defendants will not move forward with any additional wolf introductions until, at the absolute earliest, late January 2024. Accordingly, and in reliance on this representation, counsel for Plaintiffs and counsel for the state defendants determined that it would be appropriate for Plaintiffs to move for a preliminary injunction, without a temporary restraining order, with briefing and a proposed hearing completed by mid-January 2024. Counsel for the state defendants otherwise object to Plaintiffs' request for a preliminary injunction.

Counsel for Plaintiffs spoke with attorney Brian R. Herman by telephone on December 20, 2023. Attorney Brian R. Herman represents USFWS in the related District of Colorado case *Gunnison County Stockgrowers' Association et al. v. U.S. Fish and Wildlife Service et al.*, case no. 1:23-cv-03258-RMR. At the time of the conversation, USFWS had not been formally served in the case here. Notwithstanding, attorney Brian R. Herman indicated that although USFWS had not been formally served, and he could not take a formal position whether he represented

USFWS in the instant case, USFWS would object to Plaintiffs' request for a preliminary

injunction.

## CERTIFICATE OF SERVICE

I hereby certify that on this 22nd day of December, 2023, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to all counsel of record.

_/s/ Meaghan E. Fischer_
Meaghan E. Fischer