**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge Regina M. Rodriguez**

Civil Action No. 23-cv-03294-RMR

COLORADO CONSERVATION ALLIANCE, a Colorado Nonprofit Corporation,
CHRISTOPHER JURNEY, and
MICHAEL CLARK,

      Petitioners,

v.

U.S. FISH AND WILDLIFE SERVICE,
COLORADO PARKS AND WILDLIFE COMMISSION,
COLORADO DIVISION OF PARKS AND WILDLIFE,
DAN GIBBS, in his official capacity as Executive Director of the Colorado Department of
Natural Resources, and
JEFF DAVIS, in his official capacity as Director of Colorado Parks and Wildlife,

      Respondents,

and

DEFENDERS OF WILDLIFE, CENTER FOR BIOLOGICAL
DIVERSITY, HUMANE SOCIETY OF THE UNITED STATES,
WESTERN WATERSHEDS PROJECT AND WILDEARTH
GUARDIANS,

Respondent-Intervenors.

---

**ORDER**

---

This matter is before the Court on Respondent-Intervenor Defenders of Wildlife's

("Defenders") Motion to Dismiss, ECF No. 43, and Respondents Colorado Parks and

Wildlife Commission and Colorado Division of Parks and Wildlife ("CPW"), Dan Gibbs,

and Jeff Davis (collectively, the "State Respondents") Motion to Dismiss, ECF No. 46. The Motions are fully briefed. For the following reasons, the Court GRANTS the Motions.

## I.      BACKGROUND

In 2020, Colorado voters narrowly voted to adopt a state law directing CPW to restore gray wolves to Colorado by December 31, 2023. That law, codified at C.R.S. § 33-2-105.8, directs CPW to begin by developing a plan for restoration and management of gray wolves in Colorado. The resulting Wolf Restoration and Management Plan (the "Wolf Plan") involves (1) capturing and releasing gray wolves in Colorado and (2) managing them post-release in a way to minimize conflicts with farmers and ranchers. *See* Colorado Parks & Wildlife, Colorado Wolf Restoration and Management Plan (May 3, 2023) retrieved from: https://cpw.state.co.us/Documents/Wolves/2023-Final-CO-Wolf-Plan.pdf (last visited October 3, 2024) (hereinafter "Wolf Plan").[1]

To provide State Respondents with additional management flexibility of the wolves once they are introduced into Colorado, CPW asked the United States Fish and Wildlife Service ("USFWS") to designate the proposed gray wolf population as a "nonessential, experimental" population under Section 10(j) of the Endangered Species Act ("ESA"), 16 U.S.C. § 1539(j). As required by the National Environmental Policy Act ("NEPA"), USFWS completed an environmental impact statement ("EIS") analyzing the effects of adopting the 10(j) rule and alternatives to it. The public was permitted to participate and submit comments on the draft rule and draft EIS from February 17, 2023 to April 18, 2023.

---

[1] The Wolf Plan is attached to the Amended Complaint and therefore incorporated by reference. ECF No. 38-2 ¶ 7.

Petitioners, the Colorado Conservation Alliance ("CCA"), Christopher Jurney, and Michael Clark, were among the public participants that submitted comments. After extensive public involvement, USFWS issued the final EIS ("FEIS") in September 2023, a Record of Decision ("ROD") in October 2023, and a final 10(j) rule on November 8, 2023.  U.S. Fish & Wildlife Serv., Final Environmental Impact Statement - Colorado Gray Wolf 10(j) Rulemaking (Sept. 2023); U.S. Dep't of Interior, Fish & Wildlife Serv., Record of Decision - Establishment of a Nonessential Experimental Population of the Gray Wolf (Canis lupus) in Colorado (Oct. 2023); 88 Fed. Reg. 77014 (Nov. 8, 2023). The rule took effect December 8, 2023. 88 Fed. Reg. at 77014. In late December 2023, CPW trapped and transferred ten gray wolves from eastern Oregon to Colorado.

Petitioners filed this lawsuit challenging State Respondents' actions related to the capture and release of gray wolves in Colorado and alleging that USFWS's 10(j) rule is deficient. As relevant here, Petitioners argue that (1) State Respondents violated NEPA and the APA by failing to conduct or complete the environmental review process required by NEPA for wolf introduction itself (Count II) and (2) State Respondents violated Section 9 of the ESA by capturing wolves and releasing them in Colorado, and because the release of gray wolves risks harm to the Mexican wolf (Counts III and IV). Petitioners seek declaratory and injunctive relief preventing Defendants from moving forward with the introduction of gray wolves in Colorado pending Defendants' full compliance with NEPA and the APA.

State Respondents and Defenders move to dismiss Counts II, III, and IV. State Respondents argue that (1) this Court lacks jurisdiction over them because they are

immune from this suit under the Eleventh Amendment; (2) the Court lacks subject matter jurisdiction over CPW as to Count II because NEPA's requirements do not apply to state agencies; (3) Petitioners have failed to state a claim as to Count III; and (4) Petitioners lack standing as to Count IV. ECF No. 46. Defenders also argue that Petitioners have failed to state a claim as to Count III and lack standing as to Count IV. ECF No. 43.

## II.   APPLICABLE LEGAL STANDARDS

### A.   12(b)(1)

Under Federal Rule of Civil Procedure 12(b)(1), a defendant may move to dismiss a case by asserting that the Court lacks subject matter jurisdiction over the claims in the operative complaint. "[Federal] [d]istrict courts have limited subject matter jurisdiction and may [only] hear cases when empowered to do so by the Constitution and by act of Congress." *Radil v. Sanborn W. Camps, Inc*., 384 F.3d 1220, 1225 (10th Cir. 2004) (internal quotation marks omitted). "A court lacking jurisdiction cannot render judgment but must dismiss the case at any stage of the proceedings in which it becomes apparent that jurisdiction is lacking." *Basso v. Utah Power & Light Co*., 495 F.2d 906, 909 (10th Cir. 1974). This standard applies to individual claims as much as entire cases. *See, e.g., Estate of Harshman v. Jackson Hole Mountain Resort Corp*., 379 F.3d 1161, 1166 (10th Cir. 2004).

Rule 12(b)(1) motions generally take one of two forms: a facial attack or a factual attack. Here, the Court faces a factual attack, which gives the Court "wide discretion to allow affidavits, other documents, and a limited evidentiary hearing to resolve disputed jurisdictional facts." *Holt v. United States*, 46 F.3d 1000, 1002 (10th Cir. 1995). In such

circumstances, the Court's reference to evidence beyond the pleadings will not convert the motion to one under Rules 56 or 12(b)(6), unless the jurisdictional question is intertwined with the merits of the case. *Id.*; cf. Fed. R. Civ. P. 12(i) ("If a party so moves, any defense listed in Rule 12(b)(1)–(7)—whether made in a pleading or by motion—and a motion under Rule 12(c) must be heard and decided before trial unless the court orders a deferral until trial.").

**B.     12(b)(6)**

A Rule 12(b)(6) motion tests the sufficiency of a complaint. To survive such a motion, a complaint must set forth enough facts "to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). The reviewing court must "accept the well-pleaded facts alleged as true and view them in the light most favorable to the plaintiff." *Clinton v. Sec. Benefit Life Ins. Co.*, 63 F.4th 1264, 1275 (10th Cir. 2023). It need not, however, accept: "mere conclusory statements," *Iqbal*, 556 U.S. at 678; legal conclusions, including legal conclusions "couched as a factual allegation," *id.*; or "allegations plainly contradicted by properly considered documents or exhibits," *Clinton*, 63 F.4th at 1275.

The Court's review "consider[s] the complaint's allegations 'taken as a whole'" and also "may consider certain documents outside the four corners of the complaint" without converting the motion into one for summary judgment. *Id.* (internal quotation marks omitted). These include "documents incorporated by reference in the complaint; documents referred to in and central to the complaint, when no party disputes [their]

authenticity; and matters of which a court may take judicial notice." *Id.* (quoting *Berneike* v. *CitiMortgage, Inc.*, 708 F.3d 1141, 1146 (10th Cir. 2013)).

## III.     ANALYSIS

### A.     Eleventh Amendment

State Respondents move to dismiss all claims against the Commission and the Division (collectively, "CPW"), as well as against Executive Director Gibbs and Director Davis, on the grounds that they are immune from suit under the Eleventh Amendment. Because State Respondents' assertion of immunity challenges the subject matter jurisdiction of the Court, the Court resolves this issue first. *See Jones v. Courtney,* 466 F. App'x 696, 699 (10th Cir. 2012) ("Where it applies, the Eleventh Amendment 'deprives federal courts of . . . jurisdiction.' ") (quoting *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 99 n. 8 (1984)).

The Eleventh Amendment prohibits federal courts from exercising jurisdiction over citizen suits asserted against a state or state agency. U.S. Const. amend. XI; *Hans v. Louisiana*, 134 U.S. 1, 18 (1890); *Tarrant Reg'l Water Dist. v. Sevenoaks,* 545 F.3d 906, 911 (10th Cir. 2008). However, "[t]he sovereign immunity afforded by the Eleventh Amendment is not absolute." *Amisub (PSL), Inc. v. State of Colo. Dep't of Soc. Servs.*, 879 F.2d 789, 792 (10th Cir. 1989). "A state may waive its Eleventh Amendment immunity and consent to suit in federal court." *Johns v. Stewart*, 57 F.3d 1544, 1553 (10th Cir. 1995). "In addition, Congress may abrogate the states' Eleventh Amendment immunity." *Id.* Finally, the *Ex parte Young* doctrine permits a suit against a state official in federal court which seeks prospective relief for violations of federal law, even if the state would

otherwise be immune. *See Elephant Butte Irr. Dist. of New Mexico v. Dep't of Interior,* 160 F.3d 602, 608 (10th Cir. 1998) (citing *Ex parte Young,* 209 U.S. 123, 159–60 (1908)). Because the Eleventh Amendment applies differently depending on who is being sued, the Court first addresses its applicability to CPW and then to Gibbs and Davis.

### 1.    CPW

Petitioners have not alleged that Congress abrogated state immunity or that CPW has waived its Eleventh Amendment immunity and consented to be sued. *See Johns v. Stewart,* 57 F.3d 1544, 1552 (10th Cir. 1995)  (waiver of Eleventh Amendment immunity "must be unequivocal" and "stated by the most express language or by such overwhelming implication . . . as [to] leave no room for any other reasonable construction."). Rather, Petitioners' argument for this Court's jurisdiction over CPW is intertwined with its claim against State Respondents for violation of the APA and NEPA. That is because the Tenth Circuit has held—and State Respondents concede—that a state agency that participates in and accepts funding for a "major federal action" may be enjoined for failure to comply with NEPA. *See Ross v. Federal Highway Admin.,* 162 F.3d 1046, 1051 (10th Cir. 1998); *see also S.C. Wildlife Fed'n v. Limehouse*, 549 F.3d 324, 330 (4th Cir. 2008) ("[F]ederal courts have a 'form of pendent jurisdiction . . . based on necessity' over claims for injunctive relief brought against state actors in order to preserve the integrity of federal remedies.") (citation omitted).

Accordingly, to determine whether the Court may enjoin CPW, it is necessary to first address whether State Respondents were required to comply with NEPA as alleged in Count II. That claim alleges that State Respondents violated the APA and NEPA by

failing to analyze the impact of releasing gray wolves in Colorado prior to introducing the wolves, which they contend was a "major federal action." *See* ECF No. 38-2 ¶¶ 133-46. State Respondents argue the Court lacks subject matter jurisdiction as to Count II because the reintroduction of gray wolves to Colorado was a state action, not a "major federal action" subject to NEPA. ECF No. 46 at 7. Having considered the parties' arguments, the Court concludes that State Respondents were not required to comply with NEPA prior to reintroducing wolves to Colorado because the reintroduction is not a "major federal action."

Under NEPA, federal agencies are required to prepare a "detailed statement," known as an EIS, for all "major federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C). "Major federal actions" requiring the preparation of an EIS include "new and continuing activities, including projects and programs entirely or partially financed, assisted, conducted, regulated, or approved by Federal agencies…" 40 C.F.R. § 1508.1(q)(2). Overall, "major federal actions" are "actions by the federal government . . . and nonfederal actions with effects that may be major and which are potentially subject to Federal control and responsibility." *Ross*, 162 F.3d at 1051 (additional citations omitted) (emphasis added). "In effect, major federal action means that the federal government has actual power to control the project." *Id.* (internal quotation marks omitted); *see also Zeppelin v. Fed. Highway Admin.*, 293 F. Supp. 3d 1267, 1283-85 (D. Colo. 2017) (a non-federal entity may be enjoined in an APA case where the state took federal money and participated in a federal process such that it may fairly be subjected to federal requirements).

The Tenth Circuit has provided guidance on when non-federal activities amount to major federal actions. For example, in *Ross*, the Tenth Circuit held that Kansas's freeway building project was a "major federal action" even though Kansas ultimately attempted to refuse federal funds. *Ross*, 162 F.3d at 1046-50. The Tenth Circuit reasoned that Kansas authorities "could not rid the project of federal involvement simply by withdrawing the last segment of the project from federal funding" because Congress had appropriated funds for the entire freeway project; Kansas had sought federal approval at every stage of the project up until its attempt to withdraw the disputed segment; and Kansas had spent more than $10 million of the federally appropriated money, including $108,000 on the disputed segment. *Id.* at 1050-1053.

On the other hand, in *Village of Los Ranchos de Albuquerque v. Barnhart*, the state sought federal funding and assistance preparing an EIS for a bridge-building project, but ultimately decided to build the bridge with municipal bond proceeds. 906 F.2d 1477, 1459 (10th Cir. 1990). Despite the fact that the federal government had already contributed close to $59,000 for the EIS, the Tenth Circuit concluded that the voluntary preparation of an EIS and federal advice concerning where to locate a project did not establish the requisite level of federal involvement. *Id.* at 1482. Drawing guidance from a previous Tenth Circuit decision, the court in *Los Ranchos* noted that the federal "influence must be more than the power to give nonbinding advice to the nonfederal actor . . . . Rather, the federal agency must possess actual power to control the nonfederal activity." *Id.* at 1482 (citing *Sierra Club v. Hodel*, 848 F.2d 1068, 1089 (10th Cir. 1988), *overruled on other*

*grounds by Village of Los Ranchos De Albuquerque v. Marsh*, 956 F.2d 970 (10th Cir. 1992).

In *Zeppelin*, Judge Martinez considered this Tenth Circuit precedent and concluded:

> Reading *Ross and Los Ranchos* together, it appears that in the Tenth Circuit a non-federal entity may be enjoined in an APA case under a consent theory—the state or local government took federal money and participated in a federal process, so it may fairly be subjected to federal requirements— but such consent is not in all cases irrevocable. In *Los Ranchos*, there was comparatively little federal involvement (although the municipality certainly took federal money) whereas in *Ross*, federal involvement was pervasive and long-standing. Somewhere in between those two poles, a non-federal entity's participation with the federal government becomes irrevocable consent to federal statutory requirements, such as NEPA, which is enforceable through the APA.

293 F.Supp.3d at 1286.

Here, the Court finds that State Respondents' participation with the federal government as part of its plan for wolf reintroduction in Colorado does not reach the level necessary to subject State Respondents to NEPA's requirements. The Wolf Plan provides that CPW—not the federal government—decides where it will get wolves, how many it will capture, how it will transport them, and where it will release them. *See generally* Wolf Plan. The ROD for the 10(j) rule explains that "[t]he reintroduction of wolves to the State of Colorado is a State-led action that does not require the approval of the Service." *See* ROD at 2.   The ROD further explains that "[t]he ESA does not prohibit the State of Colorado from partnering with other states to capture gray wolves in states where they are not listed under the ESA and transport those wolves to Colorado for release." *Id*.

Nevertheless, Petitioners allege that there is "extensive federal involvement." ECF No. 38-2 ¶ 8. In support of their argument, Petitioners cite to portions of the Wolf Plan that provide for "close coordination;" "cooperation with;" and "communication with" USFWS. *See* ECF No. 47 at 4. But that State Respondents may coordinate, cooperate, and communicate with USFWS does not convince this Court that USFWS has the power to control State Respondents' activities. Rather, this shows nothing more than that State Respondents will consult and receive advice from USFWS on certain aspects of its plan. Because the federal agency's authority to influence non-federal activity "must be more than the power to give nonbinding advice to the nonfederal actor," *Hodel*, 848 F.2d at 1089, the Court does not find that the USFWS's involvement here rises to the level necessary to find that State Respondents have consented to NEPA's statutory requirements.

Additionally, State Respondents assert that no federal agency funds, controls, or is involved in CPW's wolf capture and release and Petitioners have not shown otherwise. *See* ECF No. 24-1 at 4. The only mention of potential federal funding in the Wolf Plan is that "[s]eparate funds for compensation and conflict minimization (nonlethal or lethal) can provide opportunities for specific kinds of funding sources. For example, federal livestock demonstration funds can be used for livestock loss compensation, and APHIS nonlethal funding as well as private donations could support conflict minimization." Wolf Plan at 42. But there is no indication that there has been any federal funding thus far and the Court does not find that the use of federal livestock demonstration funds would result in the requisite level of federal involvement. *See Los Ranchos*, 906 F.2d 1482 (federal

government's contribution of $59,000 toward project not enough to establish requisite level of federal involvement). Thus, the Court finds that USFWS has no meaningful control over and has provided no funding for State Respondents' capture, transfer, and release of wolves in Colorado. The only meaningful involvement from USFWS is its promulgation of the 10(j) rule for post-release wolf management, but—as Petitioners acknowledge—USFWS conducted an EIS in accordance with NEPA for that aspect of the plan.

Accordingly, Petitioners have failed to show that the decision to release wolves in Colorado was a "major federal action" subject to NEPA. Therefore, the Court concludes it lacks subject matter jurisdiction over State Respondents as to Count II and dismisses that claim. Because Count II is dismissed and Petitioners have not shown that any other exception to CPW's Eleventh Amendment immunity applies, all claims against CPW are likewise dismissed.

### 2. Gibbs and Davis

Petitioners assert that their claims against Gibbs and Davis in their official capacities may nevertheless go forward under the *Ex parte Young* doctrine. "Generally, the law considers state officials acting in their official capacities to be acting on behalf of the state and immune from unconsented lawsuits under the Eleventh Amendment." *Elephant Butte Irr. Dist. of New Mexico v. Dep't of Interior*, 160 F.3d 602, 607 (10th Cir. 1998). However, under *Ex parte Young*, the Eleventh Amendment does not bar a suit that (1) is against a state officer in their official capacity, (2) alleges an ongoing violation of federal law, and (3) seeks prospective relief. *Id.* at 608. State Respondents argue that none of these requirements are met. The Court finds that they are.

First, the claims against Gibbs and Davis are official capacity claims. Petitioners allege that Gibbs and Davis are state officials exercising considerable control over wolf reintroduction in Colorado. *See* ECF No. 38-2 ¶¶ 21-22. Petitioners further allege that their reintroduction of wolves violates federal law—namely the APA, NEPA, and ESA. Thus, the Court finds that the first prong of *Ex parte Young* is satisfied because Petitioners have asserted claims against Gibbs and Davis in their official capacities. *See Elephant Butte*, 160 F.3d at 610 ("The state is not the real party in interest because the state cannot 'authorize' the officials to violate federal law.").

The second prong is also met because Petitioners allege ongoing violations of federal law. Although—as explained above—the claim against State Respondents for violation of the APA and NEPA has been dismissed, Petitioners also allege that Gibbs and Davis are violating federal law by "taking" wolves in violation of the ESA. *See* ECF No. 38-2 ¶¶ 147-165, 169. Because "the inquiry into whether a suit lies under *Ex parte Young* does not include an analysis of the merits of the claim," the Court finds that, at this stage, Petitioners have sufficiently alleged an ongoing violation of federal law. *See Verizon Md., Inc. v. Pub. Serv. Comm'n of Md.,* 535 U.S. 635, 645–46 (2002) (citation omitted).

Finally, State Respondents argue that "while Petitioners also seek prospective relief, they repeatedly ask the Court to declare past conduct unlawful." ECF No. 46 at 6. State Respondents contend that this form of declaratory relief is not available under *Ex parte Young. Id*. The Court disagrees. Generally, it is retroactive relief against the state in the form of a money judgment that is barred. *See Edelman v. Jordan,* 415 U.S. 651,

663 (1974) s*ee also Elephant Butte*, 160 F.3d at 609 (characterizing the third prong of the test as "whether the relief Plaintiffs seek is permissible prospective relief or is it analogous to a retroactive award of damages impacting the state treasury"). Here, Petitioners do not seek an award of monetary damages from the state. Rather, they seek a declaration that State Respondents have violated the ESA and ask the Court to enjoin further introduction of wolves prior to full compliance with federal law. Given this characterization of the requested relief, the Court finds that it is prospective because it asks the Court to "end a continuing violation of federal law." *See Seminole Tribe of Fla. v. Fla.*, 517 U.S. 44, 73 (1996); *see also, e.g., Pac. Rivers Council v. Brown,* No. CV 02-243-BR, 2002 WL 32356431, at *6 (D. Or. Dec. 23, 2002) (Eleventh Amendment did not bar the plaintiffs' claim for declaratory relief under the ESA); *Comm. to Save Mokelumne River v. E. Bay Mun. Util. Dist.*, 13 F.3d 305, 309–10 (9th Cir. 1993), *cert. den*., 513 U.S. 873 (1994) (Eleventh Amendment does not bar a district court from considering defendants' past conduct as it relates to ongoing or future violations); *Strahan v. Coxe*, 127 F.3d 155, 166 (1st Cir. 1997) (*Ex parte Young* applies to cases seeking prospective equitable relief against state officials for violations of the ESA).

Accordingly, the Court finds that it has jurisdiction over Gibbs and Davis under *Ex parte Young* and proceeds to the merits of the remaining claims.

### B.    Failure to State a Claim as to Count III

Both State Respondents and Defenders argue that Petitioners have failed to state a claim as to Count III. Count III alleges State Respondents, "by pursuing and capturing gray wolves in Oregon, transporting, possessing, carrying, delivering, and/or shipping

them back to Colorado where they are endangered (without a compliant EIS and accompanying 10(j) rule in place), and possessing, treating, and releasing gray wolves in Colorado, have 'taken' gray wolves where they are endangered in violation of [Section 9 of] the ESA." ECF No. 38-2 ¶ 154.

State Respondents and Defenders advance several arguments for dismissal of Count III. State Respondents argue that Petitioners have failed to allege that their actions amount to a "taking" in violation of Section 9 and, even if these actions could be considered a taking, they are authorized by the Section 6 Cooperative Agreement. Defenders argue that Petitioners cannot state a Section 9 claim for a wholly past alleged take, that ESA Section 9 is not a vehicle to contest the adequacy of a NEPA process, and that State Respondents' actions are authorized by the Section 6 Cooperative Agreement. The Court finds that the challenged actions either do not amount to a taking or are authorized by the Section 6 Cooperative Agreement. Accordingly, Petitioners have failed to state a claim for violation of Section 9 of the ESA. Having reached this conclusion, the Court does not address Defenders' additional arguments.

Section 9 of the ESA prohibits any person, including private parties, states, and federal agencies, from "taking" any endangered species listed pursuant to section 1533 "[e]xcept as provided in sections 1535(g)(2) [Section 6] and 1539 [Section 10] of [the ESA]." 16 U.S.C. § 1538(a)(1)(B)). Under the ESA, "take" means "to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to engage in any such conduct." 16 U.S.C. § 1532(19). "Harm" to a species, in turn, "may include significant habitat modification or degradation where it actually kills or injures wildlife by significantly

impairing essential behavioral patterns, including breeding, feeding, or sheltering." 50 C.F.R. § 17.3.

However, the ESA provides mechanisms that exempt certain takings of endangered or threatened species from Section 9 liability. As relevant here, Section 6 of the ESA provides that Section 9's take prohibition does not apply to any state "which is then party to a cooperative agreement with the Secretary pursuant to subsection (c) of this section . . . ." 16 U.S.C. § 1535(g)(2)(A). Under subsection (c), USFWS may enter into cooperative agreements with any state that "establishes and maintains an adequate and active program for the conservation of endangered species and threatened species." 16 U.S.C. § 1535(c). Here, Petitioners have not challenged the validity of the Section 6 Cooperative Agreement between USFWS and CPW, which allows State Defendants to "take any resident federally listed Endangered fish or wildlife for conservation purposes." *See* ECF No. 47 at 6.[2]  As explained in the USFWS ROD on the 10(j) rule, "[t]he authority for the State [of Colorado] to reintroduce the gray wolf comes from CRS [§] 33-2-105.8 and the existing ESA Section 6 Cooperative Agreement Between the Service and CPW for the Conservation of Endangered and Threatened Fish or Wildlife (Section 6 Cooperative Agreement)." *See* USFWS, Record of Decision, Establishment of a Nonessential Experimental Population of the Gray Wolf (Canis Lupus) in Colorado (Nov. 7, 2023) at 1, retrieved from https://www.fws.gov/media/final-record-decision-colorado-

---

[2] Petitioners cite the Section 6 agreement filed in *Gunnison County Stockgrowers' Association, Inc. v. U.S. Fish & Wildlife Service*, No. 1:23-CV-3258-RMR (D. Colo.), ECF No. 1-1. The Court may take judicial notice of the records in its closely related prior case. *See St. Louis Baptist Temple, Inc. v. Fed. Deposit Ins. Corp.*, 605 F.2d 1169, 1172 (10th Cir. 1979) ("Judicial notice is particularly applicable to the court's own records of prior litigation closely related to the case before it.").

gray-wolf-10j-rule (last visited October 2, 2024) (hereinafter "ROD"); *see also id.* at 2 ("The State of Colorado's final Wolf Restoration and Management Plan (State Plan) is . . . a program under its Section 6 State Management Agreement. The ESA does not prohibit the State of Colorado from partnering with other states to capture gray wolves in states where they are not listed under the ESA and transport those wolves to Colorado for release.").[3]

Petitioners concede that the Section 6 Cooperative Agreement between Colorado and USFWS "provides that '[a]ny qualified employee or agent' of CPW 'may, when acting in the course of his official duties, take any resident federally listed Endangered fish or wildlife . . . .'" ECF No. 47 at 7 (citing *Gunnison County*, No. 1:23-cv-3258-RMR (D. Colo. Dec. 11, 2023)). But Petitioners argue that the Section 6 Cooperative Agreement does not apply to the gray wolves brought to Colorado because they "are not 'resident' wolves; they are and will be artificially imported wolves from a different environment and population all together." *Id.* Petitioners contend:

> [T]he Cooperative Agreement would allow Colorado to "take" wolves naturally and already present in the state—e.g. "resident" wolves—pursuant to the terms of the Agreement. However, it does *not* authorize CPW to travel to new areas, capture wolves in an alternative location, transport them back to Colorado where they are federally listed, treat them and hold them in captivity, and subsequently release them in Colorado . . . .

*Id.* at 6-7. Petitioners' argument is unavailing for two reasons: (1) the wolves captured in eastern Oregon were unlisted wolves and therefore Section 9 does not prohibit the

---

[3] The ROD is explicitly incorporated by reference in the Amended Complaint. ECF No. 38-2 ¶ 12.

"taking" of such wolves; and (2) once in Colorado, the wolves are treated as "residents" of the state for purposes of the Section 6 Cooperative Agreement.

First, to the extent Petitioners allege that State Respondents' capture of wolves in Oregon amounts to a take, the Court finds that such allegations fail to state a claim for a take in violation of Section 9. Section 9 only prohibits the take of species listed as endangered; it does not prohibit taking a species that is not listed as an endangered species. *See* U.S.C. § 1538(a)(1). Petitioners do not dispute that the gray wolves captured and released thus far were from the unlisted population in eastern Oregon. *See* ECF No. 46 at 1-2.  Accordingly, the capture of the wolves in Oregon does not amount to a take. Likewise, Petitioners have failed to sufficiently allege that CPW committed a "take" when it transported, possessed, carried, delivered, or shipped the wolves to Colorado because the definition of "take" does not include the terms "transport," "posses," "carry," "deliver," or "ship." Section 9(a)(1)(D) of the ESA only prohibits any person from "possess[ing], sell[ing], deliver[ing], carry[ing], transport[ing], or ship[ing], by any means whatsoever, any such species taken in violation of subparagraphs (B) and (C). 16 U.S.C. § 1538(a)(D) (emphasis added). But the wolves were not "taken" from Oregon (nor have Petitioners alleged they will be taken from any area in which they are listed as endangered), because they were unlisted. Thus, they were not taken in violation of subsection (B) or (C) and the prohibition against possessing, selling, delivering, carrying, or shipping the wolves does not apply.

Second, Petitioners offer no legal support for their argument that the wolves—once released in Colorado—would not be considered "resident" wolves within the meaning of

the Section 6 Cooperative Agreement. And authority within this Circuit and the Ninth Circuit supports the view that "[i]ndividual animals are protected by the ESA based on where they are found, not based on where they originate." *Forest Guardians v. Forsgren*, No. CV 04-0143 RB/DJS, 2004 WL 7337564, at *3 (D.N.M. Oct. 12, 2004) (citing *United States v. McKittrick*, 142 F.3d 1170, 1173 (9th Cir. 1998); *see also Wyoming Farm Bureau Fed'n v. Babbit*, 199 F.3d 1224, 1235 (10th Cir. 2000) (citing "the well-established fact individual animals can and do lose Endangered Species Act protection simply by moving about the landscape."). Even if the Court were to credit Petitioners' argument that the gray wolves are not "residents" of Colorado, then they could only be residents of eastern Oregon, where they originated. And in that case, as described above, there could be no taking because gray wolves are not a listed species in eastern Oregon.

In sum, Section 9's taking prohibitions only apply to listed species and do not apply to any state which is party to a Section 6 cooperative agreement. Because the gray wolves were not a listed species in eastern Oregon, where they were captured and transported from, and because the Section 6 Cooperative Agreement exempts State Respondents from liability under Section 9 once the wolves are released in Colorado, Petitioners have failed to state a claim for violation of Section 9. Count III is dismissed.

### C.    Standing for Count IV

Finally, both State Respondents and Defenders argue that Count IV must be dismissed for lack of standing. Count IV alleges that, by releasing gray wolves in Colorado, State Respondents are violating the ESA by taking Mexican wolves in Arizona and New Mexico. ECF No. 38-2 ¶¶ 155-165. Petitioners allege that gray wolves could

migrate to Mexican wolf territory and may harm the Mexican wolf by disrupting its normal behavioral patterns and interbreed with and compete with Mexican wolves. *Id.* The Court concludes that Petitioners' allegations are insufficient to establish standing for Count IV.

Petitioners bear the burden of establishing standing for each of their claims. *W. Watersheds Project v. Interior Bd. of Land Appeals*, 62 F.4th 1293, 1296-97 (10th Cir. 2023). To have standing, Petitioners must establish three well-known elements: (1) that Petitioners have suffered an "injury in fact" that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the Respondents; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision. *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 180–81 (2000) (citing *Lujan v. Defenders*, 504 U.S. 555, 560–61 (1992)).

State Respondents and Defenders argue that Petitioners have failed to establish the first element—injury in fact. To show a sufficient injury, Petitioners must show they have a "threatened concrete interest" at stake. *New Mexico v. Dep't of Interior*, 854 F.3d 1207, 1215 (10th Cir. 2017). Allegations of an aesthetic or recreational interest in viewing or enjoying a species may suffice so long as the party describes "concrete plans" for future enjoyment, such that harm to the species causes "actual or imminent" injury. *Lujan*, 504 U.S. at 564. Ultimately, the alleged injury "must affect the plaintiff in a personal and individual way." *Id.* at 560 n.1. The ESA's citizen suit provision does not give standing to those "who claim . . . only a generalized interest shared by all citizens in the proper administration of the law." *Zivotofsky ex rel. Ari Z. v. Sec'y of State*, 444 F.3d 614, 618

(D.C. Cir. 2006). Further, a "conjectural or hypothetical" injury is not sufficiently "actual or imminent" to support standing. *See Lujan*, 504 U.S. at 560.

Here, Petitioners have not alleged a particularized interest in Mexican wolves. They do not identify any concrete plans to visit the species nor do they allege that they are affected in any personal and individual way by potential harm to Mexican wolves. All Petitioners are based in Colorado, and the Amended Complaint describes their interest, and those of CCA's members, as pertaining to ranching, farming, hunting, trapping, fishing, and recreating "in the state." *See* ECF No. 38-2 ¶ 15 (citing Clark declaration) (emphasis added); *see also id.* ¶ 16 (citing Jurney declaration). The declarations attached to the original Complaint likewise describe only activities in Colorado, not the out-of-state area in which Mexican wolves are found. *E.g.*, ECF No. 1-1 at ¶ 1 (plaintiff Jurney resides in Colorado); *id.* ¶ 14 ("The [CCA] is made up of individuals who ranch, farm, raise and produce livestock, hunt, fish, trap, and otherwise recreate in the state." (emphasis added)); ECF 1-6 ¶ 1 (plaintiff Clark resides in Colorado); *id.* at ¶ 9 ("The CCA is a Colorado not-for-profit corporation dedicated to protecting wildlife and the rights and interests of individuals who ranch, farm, produce livestock, hunt, trap, fish, recreate, and operate businesses dependent on these activities in Colorado." (emphasis added). In their response, Petitioners fail to assert anything more than "a generalized interest shared by all citizens." *See Zivotofsky ex rel. Ari Z.*, 444 F.3d at 618.

Accordingly, Petitioners have failed to establish an injury in fact. Count IV is dismissed for lack of standing.

## IV.   CONCLUSION

For the reasons stated above, Defenders of Wildlife's Motion to Dismiss, ECF No. 43, is GRANTED and State Respondents' Motion to Dismiss, ECF No. 46, is GRANTED. All claims against Respondents Colorado Parks and Wildlife Commission and Colorado Division of Parks and Wildlife are DISMISSED WITH PREJUDICE; Count II is DISMISSED WITH PREJUDICE; and Counts III and IV are DISMISSED WITHOUT PREJUDICE.

DATED:  October 10, 2024

BY THE COURT:

_____
REGINA M. RODRIGUEZ
United States District Judge